## CHOCTAW NATION v. UNITED STATES.

### No. 6.

United States Court of Claims.

Oct. 2, 1951.

Grady Lewis, Washington, D. C. (W. F. Semple and H. L. Fitzgerald, Jr., Tulsa, Okl., on the briefs), for the appellant.

John F. Curran, Enid, Okl., Asst. Atty. Gen., A. Devitt Vanech, for the appellee.

LITTLETON, Judge.

This is an appeal by the Choctaw Nation from an order of the Indian Claims Commission dismissing the petitioner's petition. The petition was filed with the Commission, and the appeal taken from the Commission's final order, under and pursuant to the Act of August 13, 1946, 60 Stat. 1049, 25 U.S.C.A. § 70.

The appeal presents the question of whether the Commission was correct in sustaining defendant's contention that the petition failed to state a claim upon which relief might be granted.

The petition alleges in substance that the petitioner and the United States entered into a treaty known as the Atoka Agreement on April 23, 1897, later ratified and confirmed by Act of Congress, approved June 28, 1898, 30 Stat. 495, and supple-

mented by a further agreement of March 21, 1902, approved by an Act of Congress dated July 1, 1902, 32 Stat. 641; that these agreements provided for the compilation of rolls of the members of the Choctaw and Chickasaw tribes of Indians and for the distribution of the lands, common property, and funds of the two tribes in equal shares to the persons found to be members of the tribes pursuant to the provisions of the two treaties; that the membership rolls were complete when a list containing the names of all those lawfully entitled to enrollment had been submitted by the Dawes Commission to, and approved by, the Secretary of the Interior; that thereupon the rolls became final and the persons whose names appeared thereon alone constituted the membership of the tribes; that notwithstanding the two agreements, Congress, by the Act of August 1, 1914, 38 Stat. 582, authorized the Secretary of the Interior to enroll some forty-one persons on the Choctaw rolls; that such act of Congress was contrary to the provisions of the aforesaid agreements; that such persons so enrolled were paid $41,000 in per capita payments over a period of years from 1916 to 1949, and that the payments were made without the assent of petitioner who is entitled to recover the principal sum so paid with interest thereon.[1]

The defendant filed a motion to dismiss the petition on the ground that the allegations therein were insufficient to state a claim upon which, as a matter of law, relief could be granted under the Indian Claims Commission Act, because the enrollment of the forty-one Choctaws pursuant to the Act of August 1, 1914, was in accordance with the terms and conditions of the Atoka Agreement, 30 Stat. 495,

1. Section 17 of the Act of August 1, 1914, 38 Stat. 582, provides in pertinent part as follows:

"The Secretary of the Interior is hereby authorized to enroll on the proper respective rolls of the Five Civilized Tribes, as indicated, the persons enumerated in Senate Document Numbered Four hundred and seventy-eight, Sixty-third Congress, second session: *Provided*, That when so enrolled there shall be paid to each and every such person out of the

funds in the Treasury of the United States to the credit of the respective tribe with which such person is enrolled the following sums in lieu of an allotment of land: * * * to each such person placed on the Choctaw * * * rolls, a sum equal to twice the appraised value of the allotment of such tribe as fixed by the Commission to the Five Civilized Tribes for allotment purposes: * * *."

and a proper exercise of the plenary power of Congress to determine who were entitled to citizenship in Indian tribes and who were entitled to participate in tribal funds. In the proceeding before the Commission, defendant made a further contention that the claim asserted was not a tribal claim but one of individual claimants over which the Commission has no jurisdiction. The Commission sustained defendant's first ground for dismissal and did not pass on the second.

In sustaining defendant's motion to dismiss plaintiff's petition, the Commission concluded that the Act of August 1, 1914, authorizing the addition of forty-one members to the Choctaw tribal rolls did not amount to a taking of the Choctaw's property without just compensation. With that conclusion we are in agreement, but for reasons differing somewhat from those stated by the Commission.

The Commission concluded that the Act of August 1, 1914, was an exercise by Congress of the same plenary power which it had exercised over the Choctaws under the Act of July 1, 1902, 32 Stat. 641, the Act of March 3, 1905, 33 Stat. 1048, and the Act of April 26, 1906, 34 Stat. 137, in each of which the procedures for making up the Choctaw roll and the criteria for membership on such rolls were changed. A number of Supreme Court decisions are cited upholding the right of Congress to exercise the powers conferred by those acts, and the conclusion was reached that those decisions equally applied to the Act of August 1, 1914.

■■■ A study of the several cases relied on by the Commission persuades us that the Supreme Court was, in those instances, upholding the power of Congress to enact legislation which changed the criteria for citizenship *prior to the final closing of the citizenship rolls*. The Act of August 1, 1914, complained of herein, affected citizenship *after* the closing of the rolls on March 4, 1907. The cases clearly establish the rule that before the

closing of the citizenship rolls, no property of any kind had vested in the members of the tribe as individuals but was still in the tribe; that Congress had full power to legislate concerning citizenship and to deal with tribal property before the closing of the rolls and the allotment in severalty of the tribal property, and accordingly no individual rights were invaded by such legislation.[2] However, once the rolls were closed, and allotments made to the members of the Choctaw tribe appearing on such rolls, certain property rights vested in those members, and the power of Congress to affect their rights by subsequent legislation was considerably abridged by the requirements of the Constitution. As the Supreme Court said in the case of Choate v. Trapp, 224 U.S. 665, 671, 32 S.Ct. 565, 568, 56 L.Ed. 941. "But there is a broad distinction between tribal property and private property, and between the power to abrogate a statute and the authority to destroy rights acquired under such law."

In the Choate case the question involved was whether or not a tax exemption provided for in the Act of June 28, 1898, the Atoka Agreement, was a right which could be abrogated by subsequent Congressional legislation passed after the land had been finally allotted. The Atoka Agreement also contained a restriction (in time) on the individual Indian's right to alienate the land allotted to him. Subsequent to the closing of the rolls on March 4, 1907, Congress passed an act, Act of May 27, 1908, 35 Stat. 312 which removed the restriction on alienation from the land allotted to the plaintiff Indian, and also provided that such land should henceforth be subject to taxation. The Supreme Court held that upon the allotment of land to the plaintiff Indian, the Atoka Agreement, contained in the Acts of June 28, 1898 and July 1, 1902 was executed, and certain enforceable rights were vested in the Indians who were on the citizenship rolls, including the right to have their land exempt from taxation.

**2.** Wallace v. Adams, 204 U.S. 415, 27 S.Ct. 363, 51 L.Ed. 547; Gritts v. Fisher, 224 U.S. 640, 32 S.Ct. 580, 56 L.Ed. 928;

Lowe v. Fisher, 223 U.S. 95, 32 S.Ct. 196, 56 L.Ed. 364.

The following excerpts from the court's opinion are pertinent, 224 U.S. at pages 670, 671, 32 S.Ct. at page 567:

"There are many cases, some of which are cited in the opinion of the supreme court of Oklahoma (Thomas v. Gay, 169 U.S. [264] 271, 18 S.Ct. 340, 42 L.Ed. [710] 743; Lone Wolf v. Hitchcock, 187 U.S. [553] 565, 23 S.Ct. 216, 47 L.Ed. [299] 306), recognizing that the plenary power of Congress over the Indian Tribes and tribal property cannot be limited by treaties so as to prevent repeal or amendment by a later statute. The Tribes have been regarded as dependent nations, and treaties with them have been looked upon not as contracts, but as public laws which could be abrogated at the will of the United States.

"This sovereign and plenary power was exercised and retained in all the dealings and legislation under which the lands of the Choctaws and Chickasaws were divided in severalty among the members of the Tribes. For, although the Atoka agreement is in the form of a contract, it is still an integral part of the Curtis act, and, if not a treaty, is a public law relating to tribal property, and as such was amendable and repealable at the will of Congress. But there is a broad distinction between tribal property and private property, and between the power to abrogate a statute and the authority to destroy rights acquired under such law. Reichert v. Felps, 6 Wall. 160, 18 L.Ed 849. The question in this case, therefore, is not whether the plaintiffs were parties to the Atoka agreement, but whether they had not acquired rights under the Curtis act which are now protected by the Constitution of the United States."

The court then pointed out that prior to 1907 the individual Indian had no enforceable right in the tribal property but did have an equitable interest therein recognized by Congress in the Curtis Act. That Act, in effect, offered the Indian a parcel of nontaxable land in return for the Indian's relinquishment of all his claims to other tribal lands. The court held that upon the delivery of the patent to the Indian, the agreement was executed and the Indian was vested with all the rights conveyed by the patent, including the right to the tax exemption. In discussing the right of Congress to remove the restriction on alienation but its lack of power to deprive the Indian of the tax-exemption on the same land, the court said, 224 U.S. at pages 673, 677, 32 S.Ct. at page 568:

"The right to remove the restriction [on alienation] was in pursuance of the power under which Congress could legislate as to the status of the ward and lengthen or shorten the period of disability. But the provision that the land should be nontaxable was a property right, which Congress undoubtedly had the power to grant. That right fully vested in the Indians and was binding upon Oklahoma.

\* \* \* \* \* \*

"There have been comparatively few cases which discuss the legislative power over private property held by the Indians. But those few all recognize that he is not excepted from the protection guaranteed by the Constitution. His private rights are secured and enforced to the same extent and in the same way as other residents or citizens of the United States. \* \* \* His right of private property is not subject to impairment by legislative action, even while he is, as a member of a tribe, subject to the guardianship of the United States as to his political and personal status."

Following the reasoning of the Choate case, it would seem that the individual Choctaws whose names appeared on the final roll of citizenship on March 4, 1907, became under a solemn agreement by the parties vested with certain rights in the tribal property and in those circumstances it is not clear that such rights could be legislated away without just compensation. Unquestionably all the Choctaws appearing on the roll became vested with all the rights conveyed by the patents to the parcels of land allotted to them, and if subsequent legislation had attempted to deprive each member of a few acres to be given to other Indians not on the rolls in 1907, such action would have constituted a taking of private property for public use.

The Act of August 1, 1914, supra, however, did not provide that the forty-one

322

persons added to the rolls should receive any of the land already allotted to the individual Choctaws. It provided that they should receive a sum of money in lieu of allotments of land, and the money was to come from the funds in the United States Treasury to the credit of the Choctaw tribe. As to that fund, the Government says the Choctaws who were on the citizenship rolls as of March 4, 1907, had no vested interest.

The Atoka Agreement as it was enacted into law, provided not only for the allotment of so many acres of land in severalty to all those Indians found to be lawfully entitled to be on the Choctaw membership rolls, but it also provided for the distribution to such members of the tribe, of other tribal property. The other tribal property referred to, consisted of the oil, mineral and gas rights, proceeds from the later sale of unallotted lands, and rentals of various kinds. The proceeds from such unallotted property were to be held in the name of the tribe until distribution *per capita* could be made. We believe that the Choctaws whose names appeared on the rolls when they were closed in 1907, were at that time vested with an interest in that undistributed property, as well as with title to the real estate actually allotted to them. The fact that distribution had not been made and nominal title to the undistributed property was still held by the tribe, did not prevent the members from being vested with enforceable rights in that property, one of which was the right to receive their proportionate shares *per capita* of the income from that property or from the proceeds upon liquidation of any portion of it by later sale.[3] We think the appellants are correct in saying that Congress could not destroy or diminish that interest of the persons on the rolls on March 4, 1907 *in violation of the Atoka Agreement* without rendering the United States liable for such breach of the agreement.

The next question is whether the Act of August 1, 1914, did destroy or diminish this vested interest in violation of the Atoka Agreement.

In order to determine the exact nature of what was done by the Act of August 1, 1914, it is necessary to turn briefly to the legislative history of that section of the act which authorized the Secretary of the Interior to enroll on the Choctaw (among others) roll the persons enumerated in Senate Document No. 478, and provided for the payment to such persons of a sum equal to twice the appraised value of the allotment which had been made to other enrolled members of the tribe.

The Atoka agreement, as amended, provided for the making of a membership roll *which would be complete when it contained the names of all those lawfully entitled to enrollment thereon*. The responsibility for compiling such roll, and the power of establishing the criteria for membership, were lodged in Congress. In carrying out that responsibility and in exercising that power, Congress passed several acts prior to the closing of the roll. Each of those acts made material changes in the procedure and in the criteria for entitlement to membership on the Choctaw roll, and Congress' power to do so was upheld by the Supreme Court of the United States in the cases mentioned earlier herein. In 1906, Congress passed its final act prior to closing the rolls, 34 Stat. 137. That act changed the criteria for enrollment by providing that children who were minors living on March 4, 1906 might be enrolled. It also provided that the rolls were to be completed and closed on March 4, 1907. As of that latter date, the persons then enrolled had presumably met all the standards prescribed by Congress in the prior legislation affecting enrollment. Those standards in general, included actual residence in Oklahoma, actual affiliation with the Choctaw tribe,

3. Gritts v. Fisher, supra; see Sections 16 and 17 of the Act of April 26, 1906 (34 Stat. 137, 143, 144), which provide that money from the sale of unallotted lands and money from other sources should be deposited in the United States Treasury to the credit of the Choctaw tribe for later distribution per capita to members named in the finally approved rolls; see also Act of June 21, 1906 (34 Stat. 325, 341, 342).

and the necessity of being alive on March 4, 1906.

 It is a matter of which we take judicial notice, that both prior to the closing of the Choctaw rolls and subsequent thereto, Representatives in Congress from the State of Mississippi were active in their efforts to bring about legislation which would permit the enrollment of so-called "Mississippi Choctaws." These Indians had never moved to Oklahoma and consequently did not meet the residence requirement of the agreement for enrollment. After the rolls were closed in 1907, and as late as 1914 when the Act of August 1, 1914, was under consideration, Senator Williams of Mississippi was still attempting to have enacted legislation which would open the Choctaw rolls to applications from alleged members of the tribe still residing in Mississippi and numbering in the thousands. In the opinion of Senator Owen of Oklahoma, such legislation would have been in direct violation of the Atoka Agreement. Senator Owen was at that time sponsoring the provision of the Act of August 1, 1914 here in issue. Speaking in support of his provision to add the names of some •400 Indians (including the 41 Choctaws) to the rolls of the Five Civilized Tribes, and in opposition to Senator Williams' proposal to open the rolls to all claimants of Choctaw blood wherever they lived, Senator Owen had the following to say: [4]

Obviously it was necessary for the Government of the United States within some reasonable time to determine who should be the people to whom the allotments should be made. * * * That roll was by act of Congress absolutely terminated on the 4th of March 1907 after 11 years of controversy. Congress by that act declared that the roll should be permanently closed as of that date. * * * We now move to put on the roll about 400 people, because since that time, from 1907 to 1914, the department [of the Interior] found about 400 people whom they thought were equitably entitled. The Senator from Mississippi takes advantage of our liberality in asking to have these people put on who have apparently an equitable right—and that is the language of the report, "apparently an equitable right"—our liberality in offering to put these Indians on the rolls and asking that this amendment should go on is taken advantage of by the Senator from Mississippi to ask a wholesale reopening of the rolls, to ask that all the 1,910 people who were put upon the rejected schedule of 1898 by the Dawes Commission, 16 years ago, be enrolled and to otherwise reopen the rolls. * * *

Mr. Vardaman. Is it not a fact that in 1907, just at the close of the rolls, the Secretary of the Interior transmitted a letter to Congress, urging that the time be extended, because he said that he could not finish the roll, and that there were others who should be included?

Mr. Owen. Yes; and Congress did not agree to change the law [the Act of April 26, 1906 providing that the rolls should be closed on March 4, 1907]. The Interior Department found at that time quite a number of cases which they did not have full opportunity to carefully consider and review under all of the regular processes which the Department follows, yet I remind the Senator that for 10 years these cases had been being heard; many of them had been heard by the Interior Department and sent back to the Dawes Commission, then sent back to the Interior Department, and then again sent back to the Dawes Commission, and were before the Secretary for a third time. * * * After 10 years the Interior Department finally closed those rolls under the instruction of Congress, and the 400 whom we ask to have enrolled are simply those whom the department, after 7 years of inquiry, since that time—from 1907 to 1914—say they believe are equitably entitled.

In 1908, in the course of hearings before the Subcommittee on Indian Affairs on H. R. 15649, Mr. Hill, an attorney for the Choctaw Nation, testified against legislation to open the rolls to applicants of the

4. Congressional Record—Senate, 63d Cong., 2d Sess., June 20, 1914, pp. 10765, 10766.

Mississippi Choctaws. In the course of his testimony, Hill admitted that there were some Oklahoma Choctaws who met all the standards prescribed by Congress and applied by the Dawes Commission and the Secretary of Interior for membership, but who had wrongfully been kept off the rolls. He stated that if those people could be singled out, the Choctaw tribe would have no objection to their being placed on the rolls to share in the future disposition of the undistributed property of the tribe.

Not long after the closing of the Choctaw rolls in 1907, Congress authorized the Secretary of Interior to make an investigation of the status of certain Oklahoma Choctaws who had not been placed upon the rolls presumably because the Secretary of Interior had not had time before March 4, 1907, to complete consideration of their cases and applications for enrollment. A Mr. Howell, an attorney in the Department, was sent to Oklahoma to conduct the investigation and in 1910, during hearings before the Committee on Indian Affairs of the House of Representatives (considering H. R. 19279, H. R. 19552 and H. R. 22830), Mr. Howell was called upon by the Committee to make a report of his investigations. Howell first described the great confusion resulting from the sudden closing of the rolls in 1907 when many cases and applications were still pending before the Secretary. He then made a detailed report on a number of the cases which had not been finally acted upon before the rolls were closed. In most cases the persons involved would have been placed on the rolls if a little more time had been available. The Committee saw its problem as one, not of "opening the rolls," but of correcting or completing the rolls within a reasonable time. Mr. Hill, attorney for the Choctaw tribe, suggested to the Committee that this might be done by having the Bill admit the persons found to meet the requirements as of 1907: "Let the bill admitting these people specify by name the people you propose that are in this class." Ultimately the persons so found entitled by the Secretary of Interior were listed in Senate Document No. 478, Sixty-third Congress, Second Session, and Section 17 of the Appropriation Act for the Indian Department, Act of August 1, 1914 provided that the Secretary of the Interior was authorized to add to the rolls of the Five Civilized Tribes the names of the persons appearing in that document.

In spite of the many requests that it do so, Congress consistently refused to "open the rolls" of any of the Five Civilized Tribes. The most it believed it could and should do, was to correct the existing final rolls by adding to them the names of persons who met all requirements of citizenship and who would have gone on the rolls in 1907 if enough time had been allowed for the Secretary to finish his consideration of their applications.

If, as it was urged to do, Congress had by the 1914 Act, opened the Choctaw rolls, changing the criteria for membership thereon by permitting persons to be enrolled who had not resided in Oklahoma prior to 1907, or who were not otherwise entitled to enrollment, such an act would have been an invasion of rights which under the Atoka Agreement had vested in the persons on the rolls when closed in 1907, and would have defeated the purpose of the Agreement to finally determine the membership of the tribe and to distribute insofar as possible, the tribal property. But Congress did not, we think, "open the rolls." By the Act of August 1, 1914 (Section 17), it did not alter in any respect the criteria for membership which had been applied to those who were on the rolls in 1907. It merely added to the rolls a group of people who met all the tests applied to those whose names had been placed on the 1907 rolls.

By enacting Section 17 of the Act of August 1, 1914, we think that Congress was merely carrying out its original undertaking expressed in the Atoka Agreement to make a complete and accurate roll of citizens. The roll, which by unilateral act of Congress, was closed in 1907, was incomplete and that fact was known by the Secretary of Interior and was called to the attention of Congress. We do not understand that the tribe is even now questioning the right of the forty-one persons named in the 1914 act to be on the rolls

of the Choctaw Nation. It now only questions the power of Congress to correct its error in omitting them in 1907. We believe that Congress did have this power. No case has been called to our attention dealing with this precise problem, but the circumstances are somewhat similar to a testamentary gift to a class where the property is of a sort that cannot all be distributed, even when the members of the class have been determined. As to real estate or personal property which is in such form that it can be and is distributed to members of the class, the class may not later be opened. But as to the income from undistributed corpus, the membership in the class may increase until the time for distribution of the corpus.[5] In the instant case we think it was proper for Congress to permit the increase in the class to share in the income from the undistributed corpus even though this would necessarily diminish the proportionate shares of the original members of the class, as long as there was no change in the requirements for membership in the class.

The power of revision and correction which was in the Secretary of Interior until March 4, 1907, Lowe v. Fisher, 223 U.S. 95, 107, 32 S.Ct. 196, 56 L.Ed. 364, ended with the closing of the rolls on that date. The power of changing the requirements for membership and enrollment which was in Congress pursuant to the Atoka Agreement, came to an end also on March 4, 1907. But the obligation of Congress to place upon the tribal roll those members of the tribe who were entitled to be thereon under the standards as they existed in 1907, did not end with the closing of the roll in 1907. Congress was as much obligated to the forty-one members of the tribe who met those standards as it was to the Choctaws who were on the rolls in 1907, and we think it had the power to correct the error of omission by placing the forty-one persons on the rolls in 1914.

For the reasons stated herein the decision of the Indian Claims Commission

holding that Section 17 of the Act of August 1, 1914, created no legal claim in favor of the Choctaw Nation is affirmed.

It is so ordered.

JONES, Chief Judge, and HOWELL, MADDEN and WHITAKER, Judges, concur.

---

**5.** Restatement of the Law of Property. Future Interests Parts 3 and 4, Sec. 295, p. 1589. A remainder to a class may be vested notwithstanding the fact that the class may be later increased. Westphal v. Westphal, 1941, Cal.App., 112 P.2d 919.