Samuel C. HALPERT, a single man, Harold A. Miller and Grace B. Miller, his wife, and Eugene B. McDonough and Lillian McDonough, his wife, Plaintiffs,

v.

Stewart L. UDALL, individually and as Secretary of the Interior of the United States of America, Defendant.

No. 614–62–Civil–EC.

United States District Court
S. D. Florida,
Miami Division.

July 10, 1964.

Leo M. Alpert, Miami, Fla., for plaintiff.

William A. Meadows, Jr., U. S. Atty., Miami, Fla., and Herbert Pittle, Dept. of Justice, Washington, D. C., for the Government.

Before JONES, Circuit Judge, and DYER and CHOATE, District Judges.

JONES, Circuit Judge:

The plaintiffs are the owners of a two-hundred-acre tract of land in Dade County, Florida, which they acquired in 1956.

In 1929 the Congress authorized the Secretary of the Interior to investigate the desirability and practicability of establishing a national park in the Everglades of Florida. 45 Stat. 1443. In the same year the Florida Legislature created an Everglades National Park Commission to acquire title to lands and transfer land to the United States for a park in the Everglades. Power was given to the United States to acquire such lands and "to pass such laws and make or provide for the making of such rules or regulations of both civil and criminal nature, and to provide punishment therefor as in its judgment may be necessary for the management, control, and protection of such lands as may be acquired by the United States under the provisions of this Act." Laws of Florida, Acts of 1929, Ch. 13887. On several occasions the Florida Legislature amended and supplemented [1] the 1929 Act. In 1961, the Florida Legislature, by a statute reciting that the Florida Commission had accomplished its purpose, repealed all of the then operative legislation.[2]

In the 1934 Act exclusive jurisdiction, with exceptions not here pertinent, was ceded to the United States over all territory deeded or conveyed to the United States. Ch. 16996, supra, § 4, amending Ch. 13887, supra, § 12. The 1947 statute made the provisions applicable not only to lands conveyed to the United States by the Florida Commission, but also to "all lands acquired for national park purposes within the present and future boundaries of the Everglades National Park by the United States of America through and by purchase, grant, condemnation, donation or any other lawful means." Ch. 23910, supra. Thus it appears that the Florida Legislature had not ceded jurisdiction and sovereignty over any lands which had not been acquired by the United States.

In 1934, the Congress authorized the establishment of Everglades National Park where title to all the lands within the area recommended by the Secretary of the Interior had been vested in the United States, with a proviso that no land for the park should be accepted "until exclusive jurisdiction over the entire park area, in form satisfactory to the Secretary of the Interior, shall have been ceded by the State of Florida to the United States." 16 U.S.C.A. §§ 410, 410a. The park was established and was dedicated by President Truman in 1947. Dovell, Florida 850–851. Another federal statute was passed in 1958. It changed the park boundaries. Some lands formerly within the park were excluded. Some lands not previously in the park were included. It was provided that property within the revised boundary

1. Laws of Florida, Acts of 1935, Chapters 16995, 16996, 16997; Laws of Florida, Acts of 1941, Chapter 20669; Laws of Florida, Acts of 1943, Chapter 21665; Laws of Florida, Acts of 1945, Chapters 22776, 23109; Laws of Florida, Acts of 1947, Chapter 23910.

2. Laws of Florida, Acts of 1961, Ch. 61–60.

should continue to be administered as Everglades National Park, but property not in federal ownership "shall be administered as a part of the park only after being acquired" as provided by the Act. 16 U.S.C.A. § 410i. Authorization was given to the Secretary of the Interior to acquire lands held in private ownership within the park boundaries and an appropriation of $2,000,000 was made for that purpose. 16 U.S.C.A. §§ 410i, 410p. The authorization for the acquisition was restricted by a proviso that no parcel within a specifically described area "shall be acquired without the consent of its owner so long as it is used exclusively for agricultural purposes, including housing, directly incident thereto, or is lying fallow or remains in its natural state." 16 U.S.C.A. § 410j. The lands of the plaintiffs are within the area covered by the proviso.

The plaintiffs bring this action against Stewart L. Udall, individually and as Secretary of the Interior, and by their complaint invoke jurisdiction under 28 U.S.C.A. § 1331, stating that the matter in controversy exceeds a value of $10,000 and arises under the Constitution and laws of the United States. Diversity jurisdiction is also claimed under 28 U.S.C.A. § 1332. The complaint alleges that by the Federal statutes plaintiffs' lands are "within the boundary and area" of the park with title remaining in the plaintiffs, that the Secretary is authorized but not required to purchase plaintiffs' land, and that the Secretary can acquire the land only with plaintiffs' consent unless they improve it for a non-agricultural use, in which event the Secretary may acquire it by eminent domain. This, say the plaintiffs, has resulted in a deprivation of their property without due process of law in violation of the Fifth Amendment. By their prayer the plaintiffs seek a decree quieting their title free from any restriction arising under the statute, a declaration that the Act of Congress of 1958 be declared unconstitutional as an encumbrance against plaintiffs' land, and restraining the Secretary from taking the position

that plaintiffs' lands are within the park and can be used only for agricultural purposes under pain of eminent domain if otherwise used.

By an amendment to their complaint the plaintiffs assert that the defendant closed a public highway which had been in use for over thirty years and had abutted the plaintiffs' lands. It was said that persons using the road were required to pass a control and identification point established by the defendant. The road, say the plaintiffs, is in a state of disrepair and hazardous to use. The prayer of the amendment seeks the removal of the barrier on the highway and the elimination of the checkpoint. The plaintiffs ask that the defendant be required to maintain the highway in a reasonably safe condition for travel by the public. Although by their pleading the plaintiffs ask that the Secretary be required to maintain the highway, their brief asserts that they do not request maintenance of the highway and that the question as to who has the duty to maintain is not an issue. The brief, which is not, of course, a pleading and does not serve the purpose of a pleading, says that a mandatory injunction should issue requiring the Secretary to restore the highway to the condition it was in immediately prior to its "obliteration." We are uninformed as to what is meant by obliteration. The word was used by plaintiffs' counsel in cross-examining a former Superintendent of the park, who repeated the word. In view of the testimony of this witness that the highway now is in about the same condition as it was in 1958, we assume that the erection of the barricade is what is meant by obliteration. The three-judge court was constituted before the amendment to the complaint was filed.

■ We first consider the highway question. The evidence, which was rather inconclusive, showed that the highway, known as Ingraham Highway, was a Florida State Highway. It extended from Miami, on the Atlantic Coast, to Cape Sable, on the Gulf Coast, traversing

lands which now comprise the southerly part of the park. It is presently open and maintained by the State to the plaintiffs' lands and runs along their south boundary. The portion of the highway which plaintiffs want the Secretary to restore runs through lands within the park owned by the United States over which the State has ceded jurisdiction. The State has conveyed to the United States all the land owned by it within the park boundaries. The portion of the highway which has been closed is wholly within the park. The State of Florida might contend that it did not convey title or cede jurisdiction of the highway to the United States. Cf. Colorado v. Toll, 268 U.S. 228, 45 S.Ct. 505, 69 L.Ed. 927. But it has made no such contention. It maintains that part of the road running from Miami or its environs, to the park boundary. It has not attempted to maintain any of the remainder of the former roadway. If Ingraham Highway, as it traverses the park, is a State Highway, such claim, if any, the plaintiffs may have for the maintenance and use, or restoration is against the State. We have no opinion as to whether the plaintiffs could successfully assert any such claim against the State, or whether the State could reopen and maintain the closed portion of the highway. These questions are not before us. We do hold that the plaintiffs have no right to require the Secretary defendant to restore and open the road.

█ A property owner cannot challenge the closing of a road where the injury to him is not materially different than that sustained by the public. Hebb v. City of Bartow, 142 Fla. 78, 194 So. 312. This is particularly true where there is another means of ingress and egress even though the other route is substantially longer. Winn v. United States, 9th Cir. 1959, 272 F.2d 282; Henry L. Doherty & Co. v. Joachim, 146 Fla. 50, 200 So. 238. See also Florida State Turnpike Authority v. Anhoco Corporation, Fla.App., 107 So.2d 51. The plaintiffs are entitled to no relief against the Secretary of the Interior by reason

of the closing of that portion of Ingraham Highway entirely within the Park.

██ There is no constitutional prohibition which prevents land in private ownership from being within the outer boundaries of a national park. The regulations of the National Park Service recognize the rights of owners of private lands within the limits of national parks to the use and enjoyment of such lands. 36 C.F.R. § 1.32. The extent to which the United States may exercise jurisdiction over such privately owned land will depend upon whether there has been a cession of jurisdiction by the State to the United States, and if so, the extent of the cession. Petersen v. United States, 9th Cir. 1951, 191 F.2d 154, cert. den. sub nom State of California v. United States, 342 U.S. 885, 72 S.Ct. 174, 96 L.Ed. 664. The statutes herein cited show that the State ceded jurisdiction only over lands acquired by the United States. The Federal Government is prohibited from administering privately owned lands as a part of the park. The Acts of Congress have not made the plaintiffs' land a part of Everglades National Park.

█ It cannot be questioned but that the United States may acquire lands for national park purposes and may do so by an exercise of the power of eminent domain. In the granting of the power by Congress to the head of a governmental department there may be restrictions or limitations on the power. The Congress might have provided had it chosen to do so, that the "hole in the doughnut" area should not, under any circumstance, be acquired as a part of the park. Had it done so, such a provision could have been changed by subsequent legislation. The plaintiffs are not prevented, by the 1958 Act of Congress, from devoting their land to any lawful use. If the land is used by the plaintiffs otherwise than for agriculture the restriction against its acquisition by the Government would terminate, but no obligation on the part of the United States to acquire the property would arise. If the

proviso containing the restriction had been omitted from the statute, the Secretary would have been authorized but would not have been required to acquire the plaintiffs' land. We cannot see how a valid grant of authority to acquire property for a public use becomes invalid and in violation of the due process clause when there is a restriction or condition annexed to the grant of authority.

■ There is no violation of any right of the plaintiffs in the maintenance of a checkpoint. This is within the police power of the United States and within the powers ceded to it by the State of Florida over park lands owned by the United States. No undue hardship or burden is cast upon the plaintiffs. If those who are charged with the administration of the Park should interfere with the full use by the plaintiffs of their property, such wrongs may be redressed.

It is the view of the majority of the Court that the statutory provision under attack is not unconstitutional as depriving the plaintiffs of property without due process of law or upon any other basis. The views of Judge Choate are set forth in his concurring opinion.

This opinion shall constitute the findings of fact and conclusions of law of the Court.

Judgment will be entered for the defendant.

CHOATE, District Judge:

I concur with the able opinion of Judge Jones except in the premise that an inclusion in a Federal Park would be in nowise a taking, or that a conditional authority to the Secretary to so acquire imposes no burden upon the lands in question. See, c. f., Alford v. Finch, 155 So.2d 790 (Fla.1963).

In the post reconstruction era of 19th Century Texas English capital together with tough, able American cowmen built fabulous land empires in Northwest Texas. State-owned land sold for $.50 per acre, and for that price these frontier entrepreneurs bought and received title to the sections lying on the outside perimeter of a block of land. Then through the law of trespass they enjoyed the exclusive use of those lands contained within this perimeter. A cattleman could obtain the exclusive use of 100,000 acres of land for about $19,000.00 by such strategic purchases. Finally, the pressures of an increasing population and an aroused populace brought an end to such practise.

It appears, however, that the Congress of the United States, collectively, has taken a page from the biography of that doughty cattleman, Col. Goodnight. Certainly, Public Law 85–482, Act of Congress of July 2, 1958 (16 U.S.C. § 410j) is nothing more than an application of the land dealing that made fortunes for the late 19th century investor in Texas ranches and cattle.

Judge Jones finds nothing actionable in this legislation. I agree that his position has the force of considerable logic. Thus, his major premise is that Congress may at any time authorize the condemnation of any land. Followed by his minor premise that in the case at hand the right of condemnation has been restricted rather than enlarged, the conclusion that the Congress has taken nothing from the plaintiff is inescapable. However, rigid logic can sometimes produce sophistry rather than truth, and this I conclude is the result here. That portion of the Act which begins

"subject to the proviso that no parcel within the following described area shall be acquired without the consent of its owner so long as * * *."

is a red flag to any title lawyer, purchaser, developer, or investor. I did not need the testimony of John A. Kotte, Esq. to recognize the fact that the Congress has by the language of its legislation impaired the title of the subject lands. The owners of equally improbable south Florida land have reaped large rewards by imaginative development in the fifty year history of the area's expansion. This Act of Congress has substantially impaired plaintiffs' ability to develop or promote these lands. Thus, I

conclude that there has been a partial taking. It is one thing to have the sword of condemnation resting available but unpointed in the governmental sheath. It is another to have it suspended like that of Damocles directly above one's property.

I concur in the result herein, because I find no justification for the relief sought by the plaintiffs. Although, in my opinion, the Act would violate the plaintiffs' rights under the Fifth Amendment, if they are not compensated for a partial taking; plaintiffs have a remedy by which to seek compensation provided by statute. There is no reason, therefore, to reach the constitutional question as I would remit the plaintiffs to the Court of Claims or to an action under the Tucker Act.