**DRAKES BAY LAND COMPANY,**
a Corporation
v.
**The UNITED STATES.**
No. 275–66.

United States Court of Claims.
April 17, 1970.

Benjamin P. Bonelli, San Rafael, Cal., attorney of record, for plaintiff.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen. Shiro Kashiwa, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

NICHOLS, Judge.*

This is an action for just compensation pursuant to the Fifth Amendment. Seeking to recover the difference between land valued at its highest and best use and its reduced current value, plaintiff claims that the diminution was caused by a Government taking. Although we agree that a taking has occurred, we believe that it was a taking of the entire property.

The subject land is a 468-acre tract located within the boundaries of the 53,-000-acre Point Reyes National Seashore area (hereinafter Seashore) as authorized in 16 U.S.C. § 459c–1 (1964), Pub.L. 87–657, approved September 13, 1962, 76 Stat. 538.

The Seashore is located on the 60,-000-acre Point Reyes peninsula in western Marin County, California, with only the easterly central part (a relatively small portion) of such peninsula being outside the Seashore boundaries. In the excluded area are located the towns of Inverness and Inverness Ridge. Subject land is adjacent to part of the excluded area, and is about halfway between the two towns. It is 35 miles north of San Francisco, 20 miles west of San Rafael, and within 50 miles of three million people in the San Francisco Bay area.

The overall central part of the Point Reyes peninsula is a relatively large area of land which narrows southwesterly into a substantial projection into the Pacific Ocean, with its broad terminal called Point Reyes. The southerly coast of this projection is the shore of Drakes Bay, where substantial inlet bays and a large sand spit exist. Northerly from Point Reyes, bounded by the Pacific Ocean, the peninsula gradually narrows until it becomes an elongated, finger-like extension of land, bounded on its easterly side by Tomales Bay, a long and narrow body of water which extends from the Pacific Ocean and separates the

northern half of the peninsula from the mainland. The southerly part of the peninsula, narrower than the central part, is basically coastal mainland bounded on the west by the Pacific Ocean.

The pertinent Seashore was the third of the national seashore recreational areas authorized by acts of Congress, following Cape Hatteras National Seashore in 1937 and Cape Cod National Seashore in 1961. Supplementing studies conducted in the 1930's under the Civilian Conservation Corps program, and having obtained donated funds of $1,-250,000 from the Avalon and Old Dominion Foundations, the National Park Service, Department of the Interior, hereinafter Park Service, completed in the 1950's a study of all shore lines of the United States, Altantic, Pacific, Gulf and Great Lakes, for creation of National seashore recreational areas.

As part of its Pacific Coast seashore survey, the Park Service published on June 30, 1957, its Preliminary Report, Point Reyes Peninsula, California, Seashore Area. The survey for that report was commenced in 1955, and the first publicity on such report was disseminated in 1958. The report proposed a 28,-000-acre national seashore area, not including subject land.

Bills authorizing the Point Reyes National Seashore were introduced in Congress in 1959, 1960, 1961, and 1962. The 1959 and 1960 bills proposed a 35,-000-acre seashore area, not including subject land. As hereinafter related, plaintiff acquired its land in early 1960, prior to the first legislative proposal in 1961, that the Seashore encompass such land. Of course, the bills introduced in 1959 through 1961 were not enacted.

Plaintiff, a California corporation, was organized on February 24, 1960, by Benjamin P. Bonelli, an attorney at law and land subdivider, resident of San Rafael, California, and David S. Adams, a subdivider, resident of San Anselmo,

* We acknowledge the help afforded by the able opinion and findings of fact submitted by Commissioner Roald A. Hogenson, though we reach a contrary result. We omit some findings which are irrelevant in view of the opinion.

California. The two organizers had obtained in December 1959 an option to purchase from Millard E. Ottinger, a 1,000-acre tract of land, all located within the Seashore area as later authorized in 1962, but no part of which was included in the proposed bills prior to 1961.

After a law suit was filed to compel specific performance of the option agreement, plaintiff acquired the 1,000-acre tract by deed on March 30, 1960. In late 1960, Bonelli and Adams agreed to a division of the land into two tracts, and Adams took title to one tract and withdrew from plaintiff corporation. The tract retained by plaintiff included a 28.8-acre parcel sold by plaintiff on January 24, 1962, and also the 468 acres comprising the subject land, which has been owned by plaintiff ever since March 30, 1960.

Subject land is located on the western slope of the Inverness Ridge on Point Reyes peninsula, with its easterly border extending along the skyline of the ridge for about 1½ miles, and with the view from the skyline being Tomales Bay to the east and the Pacific Ocean and Drakes Bay to the west. It is generally covered with bishop pines, pepper trees, alder and buckeye trees, has two year-round streams, and a lake and grassy valley area in its westerly part.

Commencing in 1955, the property adjacent easterly to subject land had been successfully subdivided and sold in small lots as Paradise Ranch Estates by the same Adams who was later an organizer with Bonelli of plaintiff corporation. Such subdivision is on the eastern slope of Inverness Ridge outside of but immediately adjacent to the Seashore.

Prior to 1960, there had been no subdivision or development of land on the Point Reyes peninsula within the Seashore area as authorized in 1962. The holdings were large dairies or beef ranches owned by wealthy families. Most of the peninsula, including the area of subject land, had been closed to the public by locked gates.

Commencing in 1960, Drakes Beach Estates, Inc., a corporation owned by Bonelli and others, engaged in subdividing, developing and sales of lots on land located at and near Drakes Bay, thereafter included in the Seashore area.

Plaintiff acquired the subject land for the purpose of subdividing and selling it in small lots or parcels. In 1961, Bonelli brought three new stockholders into plaintiff corporation to assist in financing subdivisions on subject land. They were experienced and active in the field of financing such projects by issuance and sale of property improvement bonds. Each was made an equal stockholder in plaintiff corporation with Bonelli, by his purchase of stock holdings in plaintiff corporation.

At all pertinent times, Marin County zoning ordinances permitted subdivision of subject land into single family residential units of not less than 7,500 square feet each, subject to official approval of any planned subdivision.

On February 3, 1961, plaintiff filed its Drakes Bay Pines subdivision map on subject land with the Marin County Planning Commission, requesting variances from road improvement standards previously allowed by the County of Marin in other subdivisions in the nearby area and the western part of county generally.

In late 1961 and early 1962, Bonelli had several conferences with employees of the Park Service, one of whom was James E. Cole, regarding the subdivision of subject land. Cole was regional chief of planning for the Park Service, and his major work concerned the proposed Seashore. Bonelli was advised that the Park Service believed that the pending Seashore bill would be enacted; that subject land would be within the boundaries prescribed therein; that subdivision of subject land would increase land values and make acquisition of land for the Seashore more difficult for the United States; that subdivision would scar the hills and partially destroy the

scenic value of the area; that the United States could exchange federal land for subject land under Section 8 of the Taylor Grazing Act; that defendant was currently negotiating land exchanges with other property owners on the Point Reyes peninsula; and that the Park Service urgently desired to make such an exchange with plaintiff and would fully cooperate if plaintiff would work on an exchange of its land for federal land.

In reliance on such statements, plaintiff withdrew its tentative subdivision map from the Marin County Planning Commission, and Bonelli went to various offices of the Bureau of Land Management, Department of the Interior, determined what federal lands were available for exchange, and traveled to a number of areas in California, Nevada and Arizona, viewing available federal lands.

On March 13, 1962, plaintiff again filed a subdivision map, called Drakes Bay Pines, and a petition with Marin County, proposing to subdivide 168 acres of subject land into 76 lots. Plaintiff was experiencing financial difficulties in meeting its accrued tax and mortgage liabilities, and was concerned that it would not be prepared to sell lots if the Seashore bill was not enacted in 1962.

In not requesting variances from county road standards, plaintiff reasonably believed that such a request would be futile because of pressure being exerted on the Marin County Board of Supervisors (which had to approve any variances) to prevent subdivision of land within the proposed Seashore area. Such pressure was variously being exerted by employees of the Park Service, Secretary of the Interior Stewart L. Udall, Undersecretary of the Interior James K. Carr, U. S. Representative Clement W. Miller of the congressional district covering the Point Reyes peninsula, Senator Clair Engle of California, Senator Thomas H. Kuchel of California, the Point Reyes National Seashore Foundation, the Sierra Club, numerous other conservation groups, many private citizens, and virtually every San Fran-

cisco Bay area newspaper, all advocates of the establishment of the Seashore.

When the establishment of the Seashore was first proposed, it was advocated that it should include only about 20,-000 acres, which would not have included subject land. Until January 17, 1962, the Marin County Board of Supervisors did not favor a national seashore in excess of that acreage. In 1961, they voted 4 to 1 against enlargement. Congressman Miller of that congressional district then advised the board that the Seashore bill could not be enacted unless the board passed a resolution in favor of the proposed 53,000-acre area.

George H. Ludy, Vice Chairman of the Marin County Board of Supervisors from 1960 to 1964, and previously a member of its Planning Commission, consistently opposed a national seashore larger than 20,000 acres. He was contacted by Governor Edmund G. Brown of California, the Secretary of the Interior, the Director of the National Park Service, Senator Bible of Nevada, and a number of other persons to enlist his support for enlargement of the Seashore area. He was one of the four supervisors who in 1961 voted against enlargement of the area, as was Supervisor J. Walter Blair. Public reaction to the defeat of the resolution of enlargement was so violent that Supervisor Blair was defeated in a recall election by Peter Behr, an ardent conservationist, who was a member of the advisory committee of the Point Reyes National Seashore Foundation. On January 17, 1962, Supervisor Behr voted with a majority of the board to urge approval of a 53,000-acre Seashore.

The Point Reyes National Seashore Foundation was a private conservation organization established in 1959, with a membership of 500 persons, mostly residents of Marin County. Dr. Joel Gustafson, an ardent conservationist, was its president. The Foundation, as well as the large Sierra Club of San Francisco, actively opposed subdivision and development of the Point Reyes peninsula. The Foundation by its representatives

appeared before the Marin County Board of Supervisors and submitted a petition signed by 132 local residents, opposing the granting of variances for plaintiff's proposed subdivision.

Mary R. Summers, Planning Director of Marin County, an ardent conservationist, and Margaret Azevedo, a member of the Marin County Planning Commission, were active in the founding and operation of the Point Reyes National Seashore Foundation, as was Walter Castro, Chairman of the Board of Supervisors of Marin County, and James E. Cole and George S. Collins, employees of the regional office of the Park Service. Mr. Cole was secretary and a member of the board of directors of the Foundation, and participated in the preparation of promotional material regarding the Seashore, distributed by the organization, and of petitions presented to the Board of Supervisors, seeking passage of resolutions in favor of the Seashore. The regional director of the Park Service knew of Mr. Cole's participation in the activities of the Foundation, and that Mr. Collins had helped to found the organization.

In March and April 1962, plaintiff submitted applications to the Bureau of Land Management, offering to exchange subject land in two parcels for two tracts of federal land located at Barstow and at Eureka, California. These and later applications by plaintiff never resulted in disposal of any part of subject land.

On April 2, 1962, a public hearing was held by the Marin County Planning Commission on plaintiff's pending petition and proposed subdivision map. Dr. Joel Gustafson appeared and protested approval of the map on behalf of the Point Reyes National Seashore Foundation. James E. Cole of the Park Service appeared under the direction and authorization of his Regional Director, and read the written protest of the Park Service, previously reviewed by the Regional Director, in which it was stated that the Park Service viewed with concern any activity within the proposed Seashore which would detract from the scenic character of the area or would make its acquisition by defendant more difficult, and that the Park Service believed that approval of plaintiff's subdivision would not be in the public interest.

Representatives of the Park Service actively endeavored to create favorable local opinion and influence various officials of Marin County to support the establishment of the Seashore, and to prevent subdivision and sale of land on the Point Reyes peninsula, as did some 53 civic and conservation organizations in the San Francisco Bay area and Marin County.

Between January 1, 1960, and January 31, 1963, over 700 news items regarding the Seashore and the Point Reyes peninsula were published in the San Francisco Chronicle, the San Francisco Examiner, the San Francisco News-Call Bulletin, and the San Rafael Independent Journal.

Beginning in 1962, as a result of the publicity concerning the proposed Seashore, and after receiving requests from various United States Senators and the Secretary of the Interior, the California Division of Real Estate adopted a policy of inserting language in its public reports for subdivisions, a copy of which had to be furnished to any prospective purchaser of subdivided land, that the lots to be sold were within the area of a national recreational or park area, and might be subject to condemnation by the United States. In its amended report on the previously mentioned Drakes Bay Estates subdivision, dated July 25, 1962, the California Division inserted such language in relation to the proposed Seashore. However, sales of lots in that subdivision had practically ceased by February 1962 on account of publicity that the Seashore bill would be enacted that year. There is no evidence that any such report was ever issued on plaintiff's proposed subdivision. Other than Drakes Beach Estates, two other active subdivisions on Point Reyes peninsula had California Division reports

issued prior to September 13, 1962, containing such language.

In March 1962, representatives of the California Division of Real Estate and the Marin County Planning Commission exchanged correspondence, in which it was stated that it might be considered fraudulent or immoral to sell a parcel within plaintiff's proposed subdivision on account of the pending Seashore bill. On March 30, 1962, the San Francisco Examiner and the San Rafael Independent Journal carried news articles quoting such statements. Although requested by Bonelli, the regional planning officer of the Park Service declined to issue a statement to the press that the mere sale of land within a proposed national park was not fraud.

During 1962, plaintiff took steps to obtain domestic water service to its planned subdivision. Inverness Water Company, a public utility, owning and operating the water system at Inverness, ½ mile easterly of subject land, was willing to incorporate subject land in its service area, and filed its application on March 8, 1962, with the California Public Utilities Commission, requesting that a certificate of convenience and necessity be issued, authorizing such utility company to provide water service to plaintiff's land.

At a hearing held by the Utilities Commission on May 1, 1962, Mr. Cole appeared and testified under oath for the Park Service as protestant, stating that he was testifying with the approval of the Director of the Park Service; that plaintiff's subdivisions were wholly within the boundaries of the proposed Seashore; that they were within a critical area for seashore public use; that the pending Seashore bill had alerted the public to such an extent that it was extremely doubtful that development of the subdivisions would materialize; that publicity had alerted cautious buyers that the prospect of continuing ownership within the Seashore area was poor, and that few home sites would be sold while the Seashore legislation was pending; and that the Park Service did not

believe public convenience and necessity would be served by granting the pending application, and that the position of the Park Service should be considered by the Utilities Commission.

On September 4, 1962, the California Public Utilities Commission denied the application of Inverness Water Company. Upon the enactment of the Seashore bill on September 13, 1962, that company was unwilling to consider serving water to any additional land, including subject land. However, sufficient water sources existed on subject land to supply a subdivision thereon.

The Marin County subdivision ordinance, enacted pursuant to the requirements of California statutory law, sets forth the minimum access road improvement standards deemed necessary to protect the public health, safety and welfare. It vests authority in the Planning Commission to make recommendations to the Board of Supervisors concerning proposed variances. Such board is vested with authority to approve variances or to require full compliance with the ordinance requirements, including construction of an access road to full county road standards from the edge of a proposed subdivision to the next intersecting paved county road. Marin County Counsel so advised the Board of Supervisors at the hearing held before the board on April 30, 1962, on plaintiff's pending petition and proposed subdivision map.

Sir Francis Drake Highway was the only county road in the pertinent area of the Point Reyes peninsula, to which a full standard county road could be constructed from subject land. There existed and still exist access roads from subject land to such highway, but such access roads are and were insufficient in width and otherwise deficient from full county road standards. Two possible routes existed for a full standard access road. One was easterly down the steep eastern slope of the Inverness Ridge. The other was westerly approximately 26,000 feet, following the course of an existing narrow dirt road, to and over

the ranch then owned by Edward H. and Hildegard Heims. Plaintiff and other adjacent landowners had and now have the right by prescription to the use of such existing road.

On May 29, 1962, the Board of Supervisors denied approval of plaintiff's subdivision map on the basis of its determination that construction of a county standard road down the eastern face of Inverness Ridge was not economically feasible. The reasonableness of this determination was thereafter confirmed by an independent professional civil engineer, retained by plaintiff, who advised that the grades were too steep, the radii of the turns would be too sharp, and a roadway bench of sufficient width could not be constructed.

Thereafter the Board of Supervisors, after consulting with the Marin County Engineer, advised plaintiff that the westerly route to and across the Heims ranch was the only route over which a county standard access road could be constructed to allow plaintiff to subdivide subject land.

On July 31, 1962, pursuant to California statutory law, and upon the petition of plaintiff and other interested landowners, the Board of Supervisors created an assessment district, named the Balboa Avenue and Extension Road Improvement Project, for improvement to county standards of the existing road to and through the Heims ranch, to be financed by special assessments against lands within the assessment district, and issuance and sale of improvement bonds. The board appointed an attorney and also an engineer for the district. The road was to be constructed under contracts let by the board, after acquisition or condemnation of a right-of-way of sufficient width.

Dr. and Mrs. Heims, owners of the Heims ranch, were ardent conservationists, and had previously refused to sell a right-of-way to a neighboring landowner who desired to subdivide his land. They were advocates of the establishment of the Seashore, and had consulted with an employee of the Park Service before refusing the sale to their neighbor. On May 24, 1962, Dr. Heims sent his neighbor a letter, after such neighbor had filed two subdivision maps with the County of Marin, repeating his refusal to allow subdivision access across his land. This letter was first shown to the Park Service.

The assessment district included several thousand acres along both sides of the contemplated road. All of the large landowners, except Dr. and Mrs. Heims, and most of the small landowners had signed the petition upon which the Board of Supervisors had acted to create the assessment district. Of course, plaintiff was a signer. The assessment district included the Heims ranch, thus made subject to special assessments, despite refusal of Dr. and Mrs. Heims to sign the petition.

The Heims ranch is located along Sir Francis Drake Highway, and it is undisputed that conveyance to defendant of a strip of such land along the entire highway, if accepted by defendant, would have foreclosed acquisition in eminent domain proceedings by the assessment district of a right-of-way necessary for construction of the proposed new road. After a consultation with employees of the Park Service, Dr. Heims on September 24, 1962, eleven days after enactment of the Seashore bill, wrote to Senator Kuchel of California, offering to deed such a strip of his land to the defendant, to prevent construction of the proposed road, which letter was shortly provided by the Senator to the director of the Park Service, with the comment by the Senator that he was interested in the matter.

About September 28, 1962, Dr. Heims delivered to and left in the possession of James E. Cole, regional planning chief of the Park Service, his executed quitclaim deed to the United States of a 50-foot strip of the Heims ranch along its entire border with Sir Francis Drake Highway. Mr. Cole had no authority to accept or reject the conveyance on behalf of defendant. The deed was not recorded, nor was any consideration requested

or paid. Mr. Cole's purpose in taking possession of the deed was to frustrate construction of the proposed county road by the assessment district.

On September 28, 1962, the Regional Director of the Park Service by telegram advised the Director of the Park Service that Dr. Heims desired to donate a strip of his land to prevent condemnation by the assessment district of a roadway for proposed subdivisions in the district; that the taking of the roadway by the district appeared imminent, that such a county road across the Heims ranch would accelerate expensive development and raise materially acquisition costs of the United States, and requested consultation with the Solicitor of the Department of the Interior as to whether defendant could and would accept donation of the strip of land by Dr. Heims. No action was taken by the Director on the matter. He was the person authorized to accept or reject the deed. By telegram dated November 25, 1962, Dr. Heims requested the Park Service to return the deed to him.

In the meantime, the engineer for the assessment district had surveyed the first portion of the right-of-way, and its attorney had proceeded with necessary legal work including preparation of a resolution for the Board of Supervisors preparatory to filing eminent domain proceedings on the section of the road through the Heims ranch.

On November 9, 1962, Mr. Cole telephoned the attorney for the assessment district, advised that the Park Service had in its possession a quitclaim deed from Heims to the United States, and stated that by recording the deed, if necessary, he intended to stop the acquisition by eminent domain proceedings of a right-of-way over the Heims ranch by the assessment district.

On November 11, 1962, Bonelli met with Cole in the latter's office. Cole showed Bonelli the quitclaim deed from Heims to the United States, and threatened to record the deed if anything further was done to construct the proposed county road. Cole stated that the assessment district could not condemn federal land, and that plaintiff was wasting its time and money on the road project.

On November 15, 1962, Bonelli conferred with the attorney for the assessment district, discussed the Heims quitclaim deed to the United States, and agreed that further expenditures by the assessment district would be a waste of money. Apparently, the assessment district activities ceased at that time.

On July 23, 1963, defendant acquired the Heims ranch paying $850,000 for 1,135 acres. This was the first tract of land purchased by defendant out of the first funds appropriated by Congress for land acquisition within the Seashore area. Donald E. Lee, Chief, Division of Land and Water Rights, National Park Service, was defendant's authorized agent to acquire land. During June 1963, Mrs. Heims, was told by Mr. Cole, regional planning officer, that she would have to talk to Mr. Lee about purchase by the Park Service of the Heims ranch. She telephoned Mr. Lee at Washington, D. C., explained that she and her husband were elderly people, that her husband was in ill health, that they would be willing to give the Park Service a favorable price for a prompt purchase of their land, and that otherwise they might have to sell to people who had indicated an interest in developing the property. She named a price, and Mr. Lee countered with a somewhat lesser amount, which was accepted by Mrs. Heims in a telephone call about a day later. An option to purchase was signed in the San Francisco regional office of the Park Service on July 3, 1963, with Mr. Lee in attendance, and the deed of the ranch from Dr. and Mrs. Heims to defendant was executed on July 23 and recorded on July 25, 1963.

Thereafter, as additional funds became available, the Park Service acquired further tracts of land within the Seashore area. Altogether, the Park Service has acquired 64 or 65 tracts by direct purchase, by condemnation or by

exchange for public lands, classified by the Bureau of Land Management and the Secretary of the Interior as being suitable for exchange pursuant to the Act of September 13, 1962, 16 U.S.C. § 459c–2, and the Taylor Grazing Act, 43 U.S.C. § 315.

In addition to extensive tracts in the southerly half of the Seashore area, defendant acquired two large tracts fronting on the Pacific Ocean, north of Point Reyes, and several tracts within the boundaries of the assessment district which had been created for the road improvement project over the Heims ranch. In 1967, substantial areas within the central and northerly parts of the Seashore area had not been acquired by defendant. By that time, however, subject land was surrounded on three sides by federal land, the remaining side being the steep easterly slope of Inverness Ridge, outside the Seashore area.

It is clear from the language of the "Point Reyes National Seashore Act" (hereinafter the Act), as set in the context of its legislative history, that Congress enacted it requiring and expecting that an equitable acquisition program would be effected with reasonable promptness. It is also important to note that the "Seashore" was declared in Section 2(a) to include an area set forth by metes and bounds, within which lay the land here involved. The exceptions are not here pertinent.

Before its enactment, the Point Reyes National Seashore bill (S. 476) was reshaped by several amendments directed at clarifying the status of private landowners who claimed that their interests were being unduly subordinated. Two such amendments which are pertinent to this case appear in Sec. 3(a) and are italicized below:

Sec. 3. (a) *Except as provided in section 4, the Secretary [of the Interior] is authorized to acquire, and it is the intent of Congress that he shall acquire as rapidly as appropriated funds become available for this pur-* *pose or as such acquisition can be accomplished by donation or with donated funds or by transfer, exchange, or otherwise the lands,* waters and other property, and improvements thereon and any interest therein, within the areas described in section 2 of this Act or which lie within the boundaries of the seashore as established under section 5 of this Act \* \* \*. Any property, or interest therein, owned by a State or political subdivision thereof may be acquired only with the concurrence of such owner. Notwithstanding any other provision of law, any Federal property located within such area may, with the concurrence of the agency having custody thereof, be transferred without consideration to the administrative jurisdiction of the Secretary for use by him in carrying out the provisions of this Act. *In exercising his authority to acquire property in accordance with the provisions of this subsection, the Secretary may enter into contracts requiring expenditure, when appropriated, of funds authorized by section 8 of this Act [then only $14 million], but the liability of the United States under any such contract shall be contingent on the appropriation of funds sufficient to fulfill the obligations thereby incurred.*

With reference to the first amendment italicized above, this was added by the House "in order to give the property owners in the area such assurance as can practically be given at this time that there will not be undue delay when they wish to sell their lands and in order to minimize the risks of price rises that may throw present cost estimates out of line", H.R.Rep. No. 1628, 87th Cong., 2d Sess. 8, U.S.Code Cong. & Admin.News, p. 2506 (1962). Although such an amendment did not emerge from the initial hearing on S. 476, it should be mentioned nevertheless that the Senate Subcommittee on Public Lands, which conducted 3 days of hearings on S. 476, evidenced a similarly sympathetic concern

for the landowners and their future prospects. *See generally* Hearings on S. 476 Before the Subcomm. on Public Lands of the Senate Comm. on Interior and Insular Affairs, 87th Cong., 1st Sess. (1961). (Hereinafter cited as Hearings on S. 476).

With reference to the second amendment italicized above—the contract authorization amendment, this was added as a floor amendment by Representative Kyl of Iowa. Commenting on the merits of S. 476, Representative Kyl directed his colleagues' attention to a plight created by prior seashore legislation, 108 Cong.Rec. 14411 (1962):

> * * * we might turn to the experience in the Cape Code area where there are people who own property who are ready to sell the property. The Government [however] is not ready to buy. The property owner must continue to pay local taxes on the property, but he cannot use his own property and he cannot sell his own property. I suggest that this kind of arrangement, if it does not violate traditional American property rights, is at least grossly unfair to the property owners in these areas.

In offering his amendment for a vote, Representative Kyl had this to say, 108 Cong.Rec. 14423 (1962):

> * * * I have offered [this amendment] * * * to amplify the authority of the Secretary of the Interior to acquire inholdings within the Point Reyes National Seashore and to give to owners of such inholdings all the assurance that we can give them that the Government will be ready to buy whenever they [the inholders] are ready to sell at a just and reasonable price.
>
> In any situation like this one, * * one of the real problems that we run into is the inability of any Government officer to commit the United States to buy in advance of appropriations. Landowners who wish to sell —perhaps because of death in the

family, perhaps for business reasons, perhaps because of age, or for any number of other good reasons—can neither be assured that the Government will buy nor find other ready buyers because of the overhanging possibility of condemnation.

> * * * * * *
>
> * * * moreover * * * my amendment will result in savings to the Government. We all know that real estate prices are advancing. If the Secretary is authorized to enter into purchase contracts in advance of appropriations, he may well be able to acquire land at a better price than if he has to wait 2, 3, or 4 years. The amendment, in other words, will be a protection both to landowners and to the Government. * * *

In response to Representative Roosevelt's question whether the above amendment "really reinforces * * * the statement that it is the intent of the Congress that the Secretary shall acquire the lands as rapidly as appropriated funds become available." 108 Cong. Rec. 14423 (1962), Representative Kyl answered thusly: "I think that intent was explicit in each of the seashore bills that we have considered * * * and it is certainly stated in this one." 108 Cong.Rec. 14423 (1962).

Although the record contains no discussion of the Kyl amendment by the Senate, the Senate Subcommittee Hearings on S. 476 are replete with testimony of witnesses espousing the contract authorization. Hearings on S. 476 at 8–9 (remarks of former Secretary of the Interior Udall); at 35 (remarks of Senator Engle, co-sponsor with Senator Kuchel of S. 476); at 73 (remarks of Representative Miller, sponsor of H.R. 2775, the House counterpart bill to S. 476); at 175–76 (remarks of Representative Cohelan, sponsor of H.R. 3244, identical companion bill to H.R. 2775); at 190 (remarks of W. Kenneth Davis, representing Point Reyes National Seashore Foundation); at 230 (remarks of Conrad Wirth, former Director of the Na-

tional Park Service). Senator Engle, of all the witnesses, best articulated the dual interests which would be served by the authorization:

> * * * *I think we should move in just as rapidly as we can to freeze the situation. These subdividers are acting within their legal rights, and until Congress acts they have a perfect right to go out there and buy up the land and put subdivisions on it.* There is no way to stop them. The only way we can stop them is for us to move as rapidly as we can.
>
> As soon as we can provide the authority for the Secretary of the Interior to go in and freeze the situation, the better it will be. There is always the idea that maybe it [condemnation] will not happen and even if it does, they can get reimbursement, * * * from the Federal Government.
>
> I am not criticizing them. They have a perfectly legal right to do what they are doing. *But we ought to move as rapidly as we can and freeze the situation as soon as we can, in order not to add to the Government cost and certainly not to add to their [subdividers'] frustration when later on they find that this area is going to be actually taken over.* (Emphasis supplied.)

▆▆▆ In the later Redwood National Park Act, P.L. 90–545 § 3(b) (1), 82 Stat. 931 (1968), title to the entire designated area vested immediately, just compensation being left for subsequent settlement. Here the Congress took steps in that direction, but did not go all the way. It contemplated that title would normally vest, not on enactment of the law, but on later acquisition by purchase, condemnation, or exchange. But it would seem, and we hold, from the language and legislative history, that it acquired an inchoate interest at once, to be perfected later. Important legal consequences follow when, as here, the Congress flatly declares that it is going to acquire land. One of these is that subsequent enhancement or diminution in value, resulting from the project itself, is excluded from Constitutional "just compensation." United States v. Reynolds, 397 U.S. 14, 90 S.Ct. 803, 25 L.Ed.2d 12 (decided February 24, 1970, slip op. at p. 3); United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943). Congress must also be deemed presumptively aware that the activities of its agents implementing its programs can effect takings without recourse to the usual machinery of land acquisition, that is, purchase or condemnation. 28 U.S.C. § 1491; Portsmouth Harbor Land & Hotel Co. v. United States, 260 U.S. 327, 43 S.Ct. 135, 67 L. Ed. 287 (1922). We have looked for an element of actual physical invasion in such cases, as in Eyherabide v. United States, 345 F.2d 565, 170 Ct.Cl. 598 (1965), but this is because there was "no official intention to acquire any property interest," *Eyherabide, supra,* 345 F.2d 567, 170 Ct.Cl. 601. We think that the activities of officials can be found to be takings much more readily when there is no official question whether the land is to be acquired, only when, and the activities involved are all directed to that ultimate end. This is a hybrid situation, not the pure legislative taking, as in the Redwoods Act, and not the pure physical invasion of land apparently unwanted as Government property, as in *Eyherabide.* The Congress was well aware of the economic harm that would result to persons who intended subdivision and others, if the inchoate taking were left unperfected. It authorized officials to employ promptly certain unusual steps to keep this from happening, notably exchanges, and contracts in excess of appropriations available for obligation. If officials ignore these means placed in their hands, but take other positive and effectual steps to prevent such exploitation, we think that a taking has occurred. Such a taking is an acquisition "otherwise" within the language of Sec. 3(a), *quot. supra.*

It is unnecessary to reach a question implicit in plaintiff's case, which is to what extent the acts of state and local officials can be imputed to the United States Government which urged them, and which were taken to further establishment of the desired National Seashore, and frustrate subdivision of Seashore land. *Cf.* United States v. Meadow Brook Club, 259 F.2d 41 (2d Cir.), cert. denied, 358 U.S. 921, 79 S.Ct. 290, 3 L.Ed.2d 239 (1958). Here, against the background of state law, defendant's own acts are enough.

After the Act was passed on September 13, 1962, plaintiff asked defendant to buy its land. In December 1962, James E. Cole, Project Manager of the National Park Service, advised Benjamin P. Bonelli that defendant did intend to acquire plaintiff's land. Communications between Bonelli and defendant, both oral and written regarding the appraisal of plaintiff's land culminated in Bonelli being advised that the land was being appraised.

In April 1963, Bonelli and another San Rafael attorney, had a conference at Point Reyes National Seashore headquarters, with James E. Cole, and a staff member. There they were shown a list of lands defendant proposed to acquire with the first $7 million appropriated by Congress. Plaintiff was designated as receiving $800,000 as partial payment for its 468 acres. Mr. Cole stated at this time that many landowners were being asked to take a partial payment out of the first appropriation.

Unfortunately, however, these representations made to plaintiff were not to be fulfilled. In the fall of 1963, after defendant had already acquired the Heims ranch—an acquisition, the commissioner found, primarily calculated to permanently defeat condemnation by the assessment district of the right-of-way access to plaintiffs land, necessary for the planned subdivision—the Park Service advised Bonelli that it no longer intended to purchase plaintiff's land as per the prediscussed scheme or, for that matter, any currently defined scheme.

In 1964 and 1965, plaintiff, exploring another avenue, again sought to exchange its land for Federal land. Defendant, however, refused to complete an exchange involving any of the lands selected by plaintiff even though such lands were designated as "high priority" for exchange by the Bureau of Land Management. The explanation given Bonelli was that the United States Department of the Interior in Washington, D. C., refused to go ahead with the exchange. It is notable, however, that during this same 2-year period defendant did complete exchanges of Federal land with other landowners in the Point Reyes National Seashore.

On March 23, 1966, plaintiff, exploring still another avenue, asked defendant to at least contract to acquire its land as authorized under Sec. 3(a) of the Act. On May 6, 1966, however, defendant refused giving three reasons: (1) All the funds available and allowed by law —$14 million—had been expended or obligated. (2) The appraisal of plaintiff's land was outdated, and it would be a waste of funds to spend money for an appraisal when there was no money to consummate the transaction. (3) If funds should become available, they probably would be insufficient to purchase the *higher priority* land and plaintiff's land. Subsequently, Congress amended the Seashore Act, raising authorized funds to $19,135,000. As predicted by the Park Service, part of this extra $5.135 million was used to exercise a 1965 option contract on higher priority land. Currently, the Service is offering option contracts to other landowners within the Seashore, including plaintiff's neighbors. To date, however, plaintiff has yet to be approached with such an offer.

The explanation behind the Park Service's consistent refusals to plaintiff's offers is simple. Plaintiff was a subdivider with fervent intent to subdivide its Point Reyes property. Despite any acquisition priorities published by the National Park Service, it is clear from the record that the Service viewed

subdividers as the primary threat to the Point Reyes Seashore both in terms of economics and aesthetics. In fact, in March 1963, Conrad Wirth, Director of the National Park Service, appeared before the Subcommittee on Deficiencies, Committee on Appropriations of the House of Representatives, requesting a supplemental appropriation of $5,000,000 to start land acquisition at Point Reyes. He testified that the funds were needed immediately primarily to buy the lands being subdivided or which were threatened by a subdivision. Hearings on Supplemental Appropriation Bill, 1963,

Before the Subcomm. of the House Comm. on Appropriations, 88th Cong. 1st Sess., 470, 477 (1963). Also scheduled for purchase, however, were lands listed as "key properties and significant properties". Our commissioner found that the Heims ranch was the only large tract listed for purchase in this latter category. Once having purchased the Heims ranch, the Service obviously perceived that plaintiff's hopes for subdivision were dashed and that therefore it was no longer immediately important to negotiate with plaintiff for sale or exchange of its land.

The commissioner found that with the purchase of the first tract of land, the Heims ranch, the private sale of real property within the boundaries of the Seashore almost completely ceased. In the period from July 23, 1963, to August 1, 1967, there were only 93 deeds recorded in the Marin County Recorder's Office representing transfers of real property within the Seashore. Of these 93 transactions, 67 recordings represented the transfer of real property to the United States. The other recordings represented the sale of real property to private purchasers who were acquiring it for the express purpose of negotiating land exchanges with the defendant. The quiescent state of land transfers within the Seashore contrasts with the rate of turnover outside its perimeters. Within a 5-mile radius of its exterior boundary, during the 4-year period after July 23, 1963, there have been approximately 2,500 deeds recorded representing transfers of real property. Plaintiff has attempted to sell its land to private purchasers but to no avail. The land is listed with two West Marin County real estate agencies but plaintiff has received no offers as a result of these listings.

■ Thus plaintiff remains without a market for its land. The private sector is not interested, understandably, because of the well publicized threat of eventual condemnation of Seashore realty. The public sector, namely the National Park Service, is not interested because after having successfully thwarted plaintiff's subdivision plans, it realizes that plaintiff is a party who can be deferred interminably, and dealt with at pleasure. We believe that such an attitude exemplifies exactly the kind of arbitrary and unreasonable treatment Congress sought to proscribe in Sec. 3(a) of the Act. We hold therefore that it was intended for the Park Service in this case to deal with plaintiff from the outset in one of the designated fashions—purchase, exchange or option contract. In this connection, we note that so long as defendant did not file a Declaration of Taking vesting immediate title in itself, it could have started a condemnation suit without having funds to pay an award already appropriated. 40 U.S.C. § 257 as construed e. g., in Barnidge v. United States, 101 F.2d 295 (8th Cir. 1939). Failure to do any of these and at the same time to deal with plaintiff as the opinion and findings describe was a taking, an acquisition "otherwise".

Plaintiff cites Foster v. City of Detroit, Mich., 254 F.Supp. 655 (E.D. Mich.1966), aff'd. 405 F.2d 138 (6th Cir.1968), which we agree fully supports its and our position. The owner of city property there held it for 10 years under threat of imminent condemnation. It had been designated as part of the site for a housing project, but the Federal funds to finance the project never be-

came available. Meanwhile, other neighboring property was condemned, plaintiff could not obtain tenants or insurance, vandals broke in, and finally the buildings became unsafe and had to be torn down. Then the city was allotted funds for an urban renewal project, condemned plaintiff's property and obtained an award in the state court as for vacant land only. The District Judge, in an exhaustive and scholarly opinion holds that the buildings were taken at some earlier date, and that the fourteenth amendment to the Federal Constitution requires the city to pay for them. He cites a number of state cases making like holdings on parallel facts. The City in the Court of Appeals, indeed, urged that jurisdiction be yielded because the Michigan courts had now embraced the District Court's view of the Constitutional requirements.

Defendant cites Halpert v. Udall, 231 F.Supp. 574 (S.D.Fla.1964), aff'd. per curiam, 379 U.S. 645, 85 S.Ct. 610, 13 L.Ed.2d 550 (1965), which has superficial similarities to the case at bar which disappear on analysis. It involves the "hole in the doughnut" in Everglades National Park, 16 U.S.C. § 410, 410a. It is interesting to note that during hearings on the instant legislation the Director of the National Park Service referred to the Everglades legislation as a precedent for the exclusion, as proposed, of ranch and dairy property so long as it was so used. Hearings on H.R. 2775 and H.R. 3244 Before the Subcomm. on National Parks of the House Comm. on Interior and Insular Affairs, 87th Cong. 1st Sess. 140 (1961). Plaintiff Halpert owned agricultural land thus excluded. His position appeared to be that the mere inclusion of his land as an enclave within the outer boundaries of a National Park constituted *per se* a taking. We, of course, do not so hold. As an added grievance he offered only the closing of a road which did not cut off all access. He wanted an injunction requiring reopening. Halpert was not subjected to anything like the campaign that

our plaintiff was. Apparently, the Park Service had no wish to disturb his use and enjoyment and desired him to stay where he was. The court holds, we think wholly in harmony with our position, that a statutory tenure of land within the outer boundaries of a park, terminable by condemnation if agricultural use ceases, is not a taking while the agricultural use continues.

It may be thought that our holding frustrates the intent of Congress because that body obviously intended that payment for land acquired for the National Seashore should be made out of funds budgeted and appropriated by it in modest amounts annually. The trouble is, it intended other things too. It intended that further economic development of land, especially by subdivision, should be halted. It intended that land be acquired before further price inflation could occur. It intended that owners with pending development plans and others concerned should be settled with promptly and not kept in unfair and damaging suspense. Hindsight shows that these objects were irreconcilable but we think the intent to do justice to the landowners had priority. The Point Reyes project has, indeed, performed valuable service as an example of what to avoid, and the Redwoods legislation shows the lesson has been learned. As to Point Reyes, the Congress must be presumed to have been aware that it had previously enacted a Tucker Act, which was available in case the convergent pressures on any landowner became great beyond its expectation, as it has saved the day in many another sticky situation.

In this type of case the fixing of the exact date of taking must be a jury verdict sort of thing. Compare, United States v. Northern Paiute Indians, 393 F.2d 786, 183 Ct.Cl. 321 (1968), in which the date of taking was fixed as 1863 but could just as well have been two years earlier or later. We think a better date than any other is that of the

refusal by defendant to purchase that followed its success in thwarting the subdivision by acquiring the Heims ranch which lay across the only feasible access. It was then that defendant effectively used its available funds to thwart plaintiff, not to compensate it.

We hold that the interest taken is the fee, not a scenic easement as plaintiff suggests. When a taking is wholly or partly legislative, as here, the interest taken is the interest the legislation contemplates. That obviously is the fee. The Act makes no mention of scenic easements.

The amount of just compensation, *i. e.,* the value of the fee, unless the parties stipulate, must be established in another trial, since our commissioner made no finding with respect thereto. We note that the plaintiff's expert testimony on just compensation apparently fails to take the rule of United States v. Reynolds, *supra,* into account. Much of the record reflects that interest in subdivision property in the area that was to become the National Seashore was at a low level until the Seashore was close to being a reality, so that subdividers could offer home sites within a region that would otherwise be unspoiled, not within the usual suburban sprawl. To be competent, testimony will have to exclude enhancement of this type. If in any way the project detracted from the value of the property that must be disregarded too. The interruption of access by the Heims purchase must clearly be disregarded.

Plaintiff is entitled to recover judgment. Unless the amount is stipulated the case will be ordered returned to the commissioner for determination of the amount of recovery pursuant to the court's opinion and to Rule 131(c) (2). The final judgment will provide that plaintiff may obtain payment of the amount awarded only upon tender of a deed to the property taken, in such form as the Attorney General may deem necessary to assure the United States a valid fee simple title.