**KLAMATH AND MODOC TRIBES and Yahooskin Band of Indians et al.**

v.

**The UNITED STATES.**

**Elva G. ANDERSON et al.**

v.

**The UNITED STATES.**

Nos. 125–61, 87–62.

United States Court of Claims.

Jan. 22, 1971.

---

Glen A. Wilkinson, Washington, D. C., attorney of record, for Klamath and Modoc Tribes and Yahooskin Band of Indians and others. Angelo A. Iadarola, Richard A. Baenen and Wilkinson, Cragun & Barker, Washington, D. C., of counsel.

William E. Rollow, Washington, D. C., attorney of record for Elva G. Anderson and others.

Floyd L. France, Washington, D. C., with whom was Asst. Atty. Gen., Shiro Kashiwa, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

DAVIS, Judge.*

These cases present challenges to the Federal Government's disposition of Indian lands in Oregon. The Klamath Indian Reservation, in that state, was created by the Treaty of October 14, 1864 (16 Stat. 707) for the Klamath and Modoc Tribes and the Yahooskin Band of Snake Indians. As of November 1953, the reservation consisted of approximately 860,000 acres, the bulk of which was forest, but also included open range, marshland, bush, and farm property. During the 1930's and 1940's continual pressures were exerted both from within and outside of the tribe for termination of federal supervision over it. Internally, two factions favored termination, but differed as to the proper method of accomplishment. One, led by the tribal governing body, demanded the retention of the tribal entity and of tribal rights. The other, headed by Wade Crawford, a member of the tribe and of its executive committee, favored the immediate creation of individual Indian rights, dissolution of the tribe, and distribution of the tribal assets to the individual Indians.

In 1953 the Congress adopted a resolution [1] declaring its policy to be to effect termination, at the earliest possible time, of federal control over various Indian tribes, including the Klamath. The resolution directed the Secretary of the Interior to submit appropriate drafts of legislation to implement this policy, which he did, and on August 13, 1954 Congress enacted the Klamath Termination Act.[2] The basic scheme of that statute, which was acceptable to all tribal factions, was to give each adult member whose name appeared on the final tribal roll an election between withdrawing from the tribe and having his interest in tribal property commuted to money to be paid to him, and, on the other hand, remaining in the tribe and participating

---

* We are indebted to Commissioner Louis Spector for his findings of fact, which we adopt with some additions, and for his opinion, which has been very helpful, and which we use in part, although we reach a different result.

1. House Concurrent Resolution 108, 67 Stat. B132.

2. 68 Stat. 718, as amended, 25 U.S.C. § 564 et seq. (1964).

in a nongovernmental tribal management plan.[3]

To pay the withdrawing members, the Secretary of the Interior was authorized to employ management experts who would (1) have an appraisal made of all tribal property; (2) determine and select the portion of tribal property which, if sold at the appraised value, would cover the claims of withdrawing members; (3) arrange for the sale of such property and the distribution of the proceeds; and (4) have a tribal management plan prepared for the remaining Indians. These tasks were to be completed at the earliest practicable time but not later than August 13, 1958.[4]

The tribal membership was to be determined by closing the tribal rolls as of midnight, August 13, 1954.[5] Upon publication in the Federal Register of the final roll, the rights in tribal property of each person whose name appeared on the roll were to become personal property which was descendible and devisable.[6] (The final roll appeared in the Federal Register on November 21, 1957.)

The management specialists retained by the Secretary in turn engaged the Stanford Research Institute to formulate guidelines for the apportionment, selection, sale and distribution of the tribal assets. The Institute's preliminary report submitted in 1956 predicted that between fifty and seventy per cent of the members would elect to withdraw

from the tribe. The 1954 Act had been drafted on the assumption that only a small proportion of the tribe would so elect. Withdrawal of the larger number would call for the sale of a considerable portion of the tribal assets to generate the money needed to pay the withdrawing members. The Stanford Institute report noted that, since the principal tribal asset was the forest, a massive withdrawal would require the liquidation within a few years of the major part of the timber lands. Such a liquidation, the report stated, would not be in the best interests of either the withdrawing or remaining Indians, or of the regional economy or the nation as a whole. The harm would result because so much timber would have to be sold that it would glut the local market and reduce prices on all timber sold in the area.[7] Moreover, the sales, in the Institute's judgment, if not restricted by a sustained yield requirement,[8] would severely deplete the timberlands and adversely affect the watershed, jeopardizing farm production and water power developments in the Klamath Basin, and subjecting both the remaining timberland and adjacent forests to increased fire hazards and insect attacks.

In response to these unanticipated problems, on August 14, 1957 Congress amended the Termination Act of 1954 by providing that no sales of tribal property could occur until the end of the second session of the eighty-fifth Congress (August 24, 1958), and by extend-

---

3. Ch. 732, § 5(a) (2), 68 Stat. 718 (1954), as amended, 25 U.S.C. § 564d(a) (2) (1964).

4. Ch. 732, § 6(b), 68 Stat. 719 (1954), as amended, 25 U.S.C. § 564e(b) (1964).

5. Ch. 732, § 3, 68 Stat. 718 (1954), as amended, 25 U.S.C. 564b (1964).

6. Ch. 732, § 4, 68 Stat. 718 (1954), as amended, 25 U.S.C. § 564c (1964). However, without the approval of the Secretary of the Interior, the property could not be alienated or encumbered until the Secretary conveyed title to the tribal property sold, and transferred title of the remaining property to the legal entity

contemplated in the tribal management plan. *Id.*

7. For example, the report projected that, if approximately 70% of the Indians withdrew, as much as 2,660 million board feet of saw timber would have to be sold in less than a year in an economic area in which sawmill production ordinarily approximated 300 million board feet per year.

8. A sustained yield requirement limits the cutting of timber during the year (or comparable period) to that portion which is equivalent to the amount of timber growth during that same period.

ing the final termination date from August 13, 1958 to August 13, 1960.[9] (The Indians now represented by the Klamath plaintiffs agreed to these extensions, while those represented by the Anderson plaintiffs did not.)

This 1957 Act did not delay the appraisal required by the original legislation, which was performed by Western Timber Services and submitted to the Secretary of the Interior who accepted it on February 20, 1958. In April 1958 the election was held; 1660 members or 77.825 per cent of the tribe chose to withdraw, 473 members to remain. An appropriate segment of the tribal property was set aside to pay the withdrawing members, which consisted of about 78 per cent of the Klamath Forest, an area known as the Klamath Marsh, timberlands not susceptible to sustained yield management, farm and grazing lands, buildings, miscellaneous tracts, and personal property. The remaining tribal property was included in the tribal management plan, and title to it was subsequently transferred by the Secretary of the Interior to a private trustee.

Meanwhile, Congress held hearings on further modifications of the Termination Act, and the Act was again amended on August 23, 1958.[10] This amendment made several significant changes in the termination scheme. First, the sale of any forest units was delayed until April 1, 1959,[11] and the final termination date was extended from August 13, 1960 to August 13, 1961.[12]

Second, restrictions were imposed on the manner of sale of that part of the Klamath Forest selected for disposition. It had to be offered in appropriate units, on competitive bidding, to private purchasers who had to submit plans for the management of the timber resources on sustained yield principles, as well as for the conservation of soil and water resources.[13] These plans were required to be incorporated as conditions in the conveyancing instruments executed by the Secretary of Agriculture. If a condition were breached by the purchaser, a forfeiture clause provided for a reversion of title to the United States. In addition, a minimum price was set for each forest unit, its "realization value". The realization value was to be derived from a review by three qualified appraisers of the prior appraisal by Western Timber Services. Each appraiser was to give full consideration to all reasonably ascertainable elements of land, forest, and mineral values, and was to estimate the fair market value of the forest units as if they had been offered for sale in a competitive market, *without limitation on use* (emphasis added), during the interval between the adjournment of the Eighty-Fifth Congress (August 24, 1958), and August 13, 1961. In the event of disagreement among the appraisers, this realization value would be determined by averaging their estimates.[14]

Third, the Government was to acquire by proclamation of the Secretary of Agriculture any "sustained yield" units remaining unsold on April 1, 1961 which, together with the Klamath Marsh, did not have an aggregate realization value in excess of $90,-000.[15] The Klamath Marsh was also to be taken by the Government on April 1, 1961, and administered as the Klamath Forest National Wildlife Refuge.[16]

9. 71 Stat. 347 (codified in scattered sections of 564, 25 U.S.C. (1964)).

10. 72 Stat. 816 (codified in scattered sections of 564, 25 U.S.C. (1964)). The tribe and those represented by the Klamath plaintiffs had sought changes in the 1954 Act (as amended in 1957) but, in the end, did not agree to all of the provisions of the 1958 Act. The persons represented by the Anderson plaintiffs opposed any change in the 1954 Act.

11. 25 U.S.C. § 564w–1(c) (1964).

12. *Id.*, § 564(e) (b) (1964).

13. *Id.*, § 564w–1(b) (1964).

14. 25 U.S.C. § 564w–1(c) (1964).

15. *Id.*, § 564w–1(d).

16. *Id.*, § 564w–1(f).

Finally, the Act provided for the termination of the services of the management specialists and for the transfer of their functions to the Secretary of the Interior.

Pursuant to this 1958 Act, a review appraisal was made by three independent appraisers who were unable to agree on one value. The realization value of these units was determined, therefore, by averaging their estimates. In December 1958 the Secretaries of the Interior and of Agriculture jointly selected the portion of the Klamath Forest to be sold, and divided it into eleven units capable of sustained yield management. The units were advertised for sale, and prospective bidders submitted a number of sustained yield management plans to the Department of Agriculture as required by the 1958 amendments. However, only one actual bid was received for any of the eleven "sustained yield" units—the Antelope Desert Unit—and was accepted. A deed covering this area was executed in May 1960 to a large private corporation.

On April 1, 1961, the ten other "sustained yield" units remained unsold, and in accordance with the 1958 Act the Secretary of Agriculture transferred these lands to the National Forest System by Proclamation of April 13, 1961. The realization value, determined by averaging the three review appraisals,[17] was deposited in the Treasury for the withdrawing Indians.

In 1959, Congress changed the date for the acquisition of the Klamath Marsh from April 1, 1961 to the earliest date after September 30, 1959 that proceeds from the sale of stamps under the Migratory Bird Hunting Stamp Act became sufficient to pay for the property.[18] By a Proclamation of September 7, 1960, the Klamath Marsh was transferred to the United States for $476,401, the average of the three review appraisals, which was also deposited in the Treasury for the benefit of the withdrawing Indians.

Other tribal property disposed of to pay the withdrawing members consisted of "fringe units" (timberlands not susceptible to sustained yield management), farm and grazing lands and miscellaneous tracts, buildings, and personal property. This property was sold to the highest bidder, without a price floor or restrictions as to use.

On August 12, 1961 the Secretary of the Interior proclaimed the termination of federal supervision over the Klamath and Modoc Tribes and the Yahooskin Band of Snake Indians, effective August 13, 1961.

Dissatisfied with the monetary results of the termination plan, the tribe filed, in 1961, a claim in this court (No. 125–61) in which it sought, *inter alia*, damages for the defendant's alleged failure to comply with the Fifth Amendment in its disposition of the tribal property. The tribe's amended petition came to include three individual withdrawing Indians, each suing on his own behalf and as the representative of the withdrawing Indians; and two individual remaining Indians, each suing on his own behalf and as the representative of the Indians who elected to remain in the tribe. (All these complainants are referred to as the Klamath plaintiffs.)

In 1962, seventy-three withdrawing Indians, each suing on his own behalf, initiated another action (No. 87–62) in which they too claimed, among other things, damages for the defendant's alleged failure to observe the requirements of the Fifth Amendment. (These Indians are called the Anderson plaintiffs.)[19]

17. The value determined was $68,716,691, which together with that of the Klamath Marsh was well within the $90,000,000 maximum limit established by Congress. See 25 U.S.C. § 564w–1(d) (1964).

18. 25 U.S.C. § 564w–1(f) (1964).

19. This court has jurisdiction of the two suits under a combination of our general jurisdictional statute, 28 U.S.C. § 1491, and of 28 U.S.C. § 1505 "The Court of Claims shall have jurisdiction of any claim against the United States accruing

The cases were consolidated by order of the court in 1964, and the duty of representation was allocated as follows: counsel in *Klamath* were to represent the individual withdrawing and remaining members named in that amended petition, and all parties similarly situated; plaintiffs in *Anderson* were authorized to make their case a class action, and counsel in *Anderson* were to represent the plaintiffs named in that petition, and all parties similarly situated.

To simplify the litigation a separate trial was held on the following issues: (1) the dates of taking of the Klamath Forest and Klamath Marsh; (2) whether or not there was a taking, and, if so, the dates thereof, or other Government liability, for the disposition by defendant of the following categories of property: the Antelope Desert Unit, fringe units, miscellaneous real property, and personal property.

The Klamath plaintiffs contend that the defendant took the Forest and the Marsh on August 23, 1958. That date is selected because in their view the restrictions imposed by the Act of August 23, 1958, *supra,* on the sale of the forest units deprived the Indians of control over the areas and assured their acquisition by the defendant. These plaintiffs claim that the same date is applicable to the Marsh because the 1958 Act gave the defendant the exclusive right to acquire it. On the second issue, the Klamath plaintiffs argue that the properties sold to third parties were

taken by the defendant by eminent domain without just compensation. They state that the dates of taking are August 23, 1958—when the 1958 Act became law—for the Antelope Desert, and the sale-dates for the fringe and miscellaneous units and personal property.

The Anderson plaintiffs originally contended that all their property interests had been taken on one date, August 13, 1958.[20] That was the time, absent any amendments to the original 1954 Act, by which federal supervision of the tribe would have had to terminate. Their claim is that the defendant's failure to end its supervision on that date deprived them, without just compensation, of property interests created by the 1954 Act.[21]

For the reasons that follow we hold: (1) There was no eminent domain taking of the Antelope Desert Unit. (2) The ten unsold "sustained yield" units of the Klamath Forest were taken by defendant under the Fifth Amendment on April 15, 1961, when it acquired those areas. (3) The Klamath Marsh was taken by eminent domain by defendant on September 7, 1960, when that property was transferred to federal ownership. (4) There was no constitutional taking of the fringe and miscellaneous units or of the personal property; the dates of sale of these units are, however, the appropriate times for assessing any Government liability which may be established in subsequent proceedings.

after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Claims if the claimant were not an Indian tribe, band or group."

20. The trial commissioner found a taking of the Klamath Forest (including the Antelope Desert) and the Klamath Marsh on August 23, 1958, when the 1958

amendment was enacted. The Anderson plaintiffs state in their brief that the ten day difference between their position and the trial commissioner's is *de minimis,* and for that reason they do not challenge the commissioner's date. However, since we reject the commissioner's conclusion, we deem it appropriate to consider the Anderson plaintiffs' original position.

21. For convenience, we reproduce in the Appendix to this opinion Commissioner Spector's detailed summary of the contentions of the parties on the issues before him.

## I

■■ When Congress deals with the Indian property it can act in one of two capacities. First, Congress can exercise a guardianship over Indian property, derived from its plenary power recognized in the Constitution to control tribal Indian affairs.[22] Or it may exercise its fundamental power of eminent domain and take Indian property, for which it must pay just compensation. Three Affliated Tribes of Fort Berthold Reservation v. United States, 390 F.2d 686, 690–693, 182 Ct.Cl. 543, 550–557 (1968). The court must determine in each instance, with regard to each piece of property, the capacity in which Congress has acted. In the general law of eminent domain there is no universal test to determine, where Congress has not expressed an intention to condemn, whether and when a taking has nevertheless occurred as a result of the Federal Government's conduct; a court must always evaluate the individual circumstances of the case to answer those questions. See United States v. Central Eureka Mining Co., 357 U.S. 155, 168, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958); Arthwohl v. United States, 434 F.2d 1319, 193 Ct.Cl. —— (Dec. 1970); Eyherabide v. United States, 345 F.2d 565, 567, 170 Ct.Cl. 598, 601 (1965); R. J. Widen Co. v. United States, 357 F.2d 988, 993–994, 174 Ct.Cl. 1020, 1027–1029 (1966). Where, however, as with the Antelope Desert, a taking is sought to be predicated on the Government's disposition of Indian property to third parties, the *Fort Berthold* opinion, *supra,* provides more detailed guidance. The criterion is whether Congress in disposing of the property has made a good faith effort to realize its full value for the Indians, whether it has in effect performed the trustee's traditional function of transmuting property into money. 390 F.2d at 691, 182 Ct.Cl. at 553. If the Government does so, there is no taking. If, on the other hand, the Government fails to make such an effort, it can be liable for a taking if it gives or sells the property to a third party. 390 F.2d at 693, *Id.* at 557. See United States v. Creek Nation, 295 U.S. 103, 109–110, 55 S.Ct. 681, 79 L.Ed. 1331 (1935).

*Fort Berthold* also recognized that, even if there has been no eminent domain taking, Indians could recover under the Indian Claims Commission Act, provided they could show that the consideration received for the property was so far below its fair market value as to amount to fraudulent conduct, gross negligence, or some other breach of the Government's fiduciary duty. 390 F.2d at 690, 182 Ct.Cl. at 551. The present cases come, not under the Claims Commission Act, but under 28 U.S.C. §§ 1491 and 1505, *supra,* note 19, and we need not now decide whether the same principle applies. By agreement of the parties, evidence of valuation was excluded from the trial, and therefore any liability predicated on the theory of breach of fiduciary duty as to the Antelope Desert or the other properties sold to third parties must await subsequent proceedings.[23] The problem for

---

22. U.S.Const. art. I, § 8, cl. 3. See Worcester v. Georgia, 31 U.S. (6 Pet.) 350, 379, 8 L.Ed. 483 (1832); Perrin v. United States, 232 U.S. 478, 482, 34 S. Ct. 387, 58 L.Ed. 691 (1914).

23. There is also a significant difference in the measure of recovery under the two theories. If a taking is found, plaintiffs are entitled to the fair market value of the property at the time of the taking, less any amount actually received for the property, plus interest on that sum from the date of the taking. Shoshone Tribe of Indians v. United States, 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360

(1937); United States v. Klamath Indians, 304 U.S. 119, 123, 58 S.Ct. 799, 82 L.Ed. 1219 (1938); Uintah and White River Bands of Ute Indians v. United States, 152 F.Supp. 953, 139 Ct.Cl. 1 (1957). If, however, damages were awarded for the Government's breach of its fiduciary obligations, no interest would be recoverable. United States v. Alcea Band of Tillamooks, 341 U.S. 48, 49, 71 S.Ct. 552, 95 L.Ed. 738 (1951); Osage Nation of Indians v. United States, 97 F.Supp. 381, 119 Ct.Cl. 592, cert. denied, 342 U.S. 896, 72 S.Ct. 230, 96 L.Ed. 672 (1951); Peoria Tribe of In-

the present is solely whether and when constitutional takings occurred.

*Antelope Desert:* The Klamath plaintiffs do not say that Congress, in the Act of August 23, 1958, *supra,* actually intended to acquire by eminent domain the Antelope Desert (or the other properties) as of that date. Contrast United States v. Gerlach Live Stock Co., 339 U.S. 725, 731–742, 70 S.Ct. 955, 94 L.Ed. 1231 (1950); Drakes Bay Land Co. v. United States, 424 F.2d 574, 191 Ct.Cl. 389 (1970). Rather, they urge that, even though there may have been no subjective Congressional intention to acquire, by eminent domain, the Antelope Desert for the United States at that very moment, a constitutional taking nevertheless occurred when the statute was enacted. This is so, it is said, because Congress did not make a good faith effort in the Act to obtain for the Indians the full value of the Desert since the legislation imposed substantial restrictions on the disposition of that property. The claim is that the combined effect of these restrictions was to insure that the full value of the Desert would not and could not be realized. Specifically, plaintiffs attack (1) the sustained yield requirement, which in their view confined the potential purchasers to those large enough to invest in a sustained yield forest, (2) the imposition of the realization value of each unit as a price floor, which allegedly was higher than the price private purchasers would be willing to pay if required to practice sustained yield management, and (3) the provision for forfeiture and reversion of title to the United States in the event the purchaser breached the sustained yield requirement.

The simplest answer to these objections (with respect to the Antelope Desert) is that the Klamath plaintiffs have failed to show any harmful impact from the disputed provisions, nor does such a showing seem possible. Our *Fort Berthold* decision has already settled that Congress makes a good faith effort to obtain full value for Indian land, to be sold to others, when it establishes and uses an adequate, competent and impartial appraisal system to value the property. 182 Ct.Cl. at 557–558.[24] That was undoubtedly done here, and the Antelope Desert was to be sold at no less than the realization value determined by the three expert, impartial appraisers. As plaintiffs recognize, the concept of realization value is derived from fair market value *without diminution for limitation on use* (see 25 U.S.C. § 564w–1(c)), and it was imposed as the minimum price of each unit to be sold (*Id.,* § 564w–1(b)), although a sustained yield covenant was required. In fact, the bid received and accepted for the Antelope Desert was for somewhat more than its realization value—that is, slightly more than fair market value, as evaluated by the appraisers. The conclusion appears inescapable, on the record now before us, that the sustained yield requirement and the realization-value price floor caused the Klamath plaintiffs no legal or economic harm since they received more than the unrestricted fair market value, fairly and objectively determined. Nor have the Klamath plaintiffs made any showing that the reversion provision operated to deprive them of any part of the fair market value of the Desert.

What these plaintiffs seem at bottom to argue is that the mere imposition of a sustained yield covenant, as well as the provision for a reversion for breach—even in the absence of any showing of measurable adverse economic impact—was so inimical to the Indians' interest as to constitute bad faith on the part of

dians v. United States, 369 F.2d 1001, 1004, 177 Ct.Cl. 762, 767 (1966), rev'd on other grounds, 390 U.S. 468, 88 S.Ct. 1137, 20 L.Ed.2d 39 (1968).

**24.** As in this case, the court was asked in *Fort Berthold* to decide the issue of taking vs. non-taking without regard to evidence as to the actual value of the lands involved. Contrast Confederated Salish and Kootenai Tribes v. United States, Ct.Cl. No. 50233, 437 F.2d 458, also decided this day.

Congress. We find that position insupportable. The trial commissioner's uncontroverted finding that Klamath tribal timber had been sold on a sustained yield basis since 1913 negates, in itself, any imputation that Congress imposed the sustained yield covenant in 1958 in order to render the Klamath Forest unsaleable. The record indicates, moreover, that this requirement was exacted because of the Government's belief that sale of the timber units on an unrestricted or clear-cutting basis would have injured the Klamath Basin economy by glutting the local timber market (see note 7, *supra*), and harmed the area's ecology and scenic beauty by destruction of the watershed and wildlife. Congress bore a high fiduciary obligation to all members of the Tribe (Seminole Nation v. United States, 316 U.S. 286, 297, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942)), and the Stanford Institute Report indicated that a large proportion of the withdrawing members would remain in the region. The Klamath plaintiffs seem to suggest, however, that because sustained-yield management benefits non-Indian residents of the area as well as Indians the defendant fails the good faith test of *Fort Berthold*. But if the valid interests of the Indians are not injured, it cannot be held against Congress that it takes account, in addition, of the needs of the general public in the region. Congress established sustained yield in order to insure the economic and ecological viability of the Klamath area. Obviously, the benefits of a viable environment inure to all its occupants, but that does not show the Indians' interests were in any way impaired or sacrificed by their guardian in its sale of the Antelope Desert. On the contrary, there is no reason to infer that true Indian interests were harmed at all.

The forfeiture provision may best be viewed as the enforcement mechanism for the sustained yield covenant. In that light, it is quite reasonable and

logical. Once payment for the Antelope Desert was received, the money—equivalent to the fair market value—was deposited in the Treasury to the account of the withdrawing Indians. They therefore realized immediately the full benefit of the sale, and any additional interest in the property granted to them, such as a reversion, would be a windfall. Moreover, it would be difficult to provide a mechanism for a reversion of the land, or even its equivalent in money, to the scattered individual withdrawing Indians. To provide a reversion to the tribe, on the other hand, would be to give the non-withdrawing members a windfall, since those members had no interest in the parcels set aside to pay the withdrawing Indians. The Federal Government was the most apt candidate to enforce the covenant. The mere remedy of an injunction by the Government to cure breaches, or for money damages, was obviously deemed insufficient. In that situation, there was no infringement of Indian rights through the provision which created the stronger sanction of a reversion in favor of the defendant.

◼ In sum, we cannot conclude on the record before us that Congress failed to make a good faith effort in the 1958 Act to realize the full value of the property, and we therefore hold that there was no taking of the Antelope Desert by the passage of that statute or its implementation.

◼ *The unsold "sustained yield" units of the Klamath Forest:* Much of what we have said in considering their Antelope Desert claim answers the Klamath plaintiffs' argument that the ten unsold "sustained yield" units were also taken by the 1958 Amendment on August 23, 1958. Unlike the Desert, these units were transferred to the Government on April 13, 1961, and the defendant does not contest that they were taken, in the strict eminent-domain sense, at that time.[25] But plaintiffs urge the earlier

25. The concession by the Government that there was a taking is quite correct. See

Confederated Salish and Kootenai Tribes v. United States, Ct.Cl. No. 50233, 437

taking-date because of the sale-restrictions in the 1958 amendments. We have already stated why the sustained yield and reversion provisions did not amount to a taking of the Antelope Desert; those reasons are even more forceful for the unsold units as to which those terms could have no possible impact because there was no conveyance (to a private purchaser) incorporating them. The Government took full title, without restriction, and will pay full fair market value as of the taking-day in April 1961. Where, as here, there is no actual interference with substantial property rights and no Congressional intention to take at once—as there was not on the passage of the 1958 legislation—there is no taking. *Cf.* Eyherabide v. United States, *supra*, 345 F.2d 565, 567, 170 Ct.Cl. 598, 601 (1965).

The Klamath plaintiffs also predicate an immediate taking of the ten unsold Forest units on other parts of the 1958 Act. They object both to the provision for review appraisals and to the concept of "realization value" which the review appraisers were to fix. The complaint against these appraisals is that they produced an even lower valuation than the original Western Timber Services appraisal, which the Indians believed undervalued their assets significantly. But the record indicates that Congress provided for review appraisals precisely because of Indian dissatisfaction with the Western Timber Services report.[26] Moreover, the procedure which Congress imposed for the review (separate reports by three independent appraisers with an averaging device as a dispute-settling mechanism) strikes one as eminently fair. That the later appraisals happened to produce a lower rather than a higher valuation of the ten units is not, of course, an invasion of the Indians' constitutional rights. This is not a case in which a diminution in value is caused by the Government's unfair prolongation

of the taking process or by a deliberate effort to drive down the compensation to be paid (see Foster v. City of Detroit, 254 F.Supp. 655 (E.D.Mich.1966), *affirmed*, 405 F.2d 138 (C.A. 6, 1968)), nor is there any reason to believe that this aspect of the 1958 amendment was designed by Congress for such unjust ends. See, also, *infra*, "The 1958 Act as a whole."

What the review appraisers were to estimate (called "realization value" in the Act) was the fair market value of the forest units, as if they had been offered for sale on a competitive market, without limitation on use, during the interval between the adjournment of the 85th Congress (August 24, 1958), and August 13, 1961.[27] The Klamath plaintiffs, misreading the latter phrase as imposing the requirement upon would-be purchasers of the ten units that they resell the units within the three-year interval, attack the restriction as unreasonable. The challenged provision does not, however, contain that limitation at all. It simply posits, for purposes of valuation, an initial sale of the units *by the Government* within that interval; it imposes no assumption whatever as to any resale by the purchaser. The only arguable deviation from the conventional formula for determining fair market value was the three-year span of the sales by the Government, and no evidence was adduced that that period was an unreasonably short one in which the sale of this Klamath property had to occur. Without such evidence, we cannot say that it was. There is no basis in judicial notice for finding three years too limited a time for applying the "willing buyer-willing seller" standard of fair market value, and on its face a three-year period would not seem unfairly truncated even for properties of this size.

The 1958 Act declared that any "sustained yield" units remaining unsold

---

F.2d 458, decided this day. The "good faith" principle of *Fort Berthold* does not apply to acquisition of Indian land by the Federal Government itself.

26. This dissatisfaction was expressed by representatives of the Klamath plaintiffs.

27. 25 U.S.C. § 564w–1(c) (1964).

on April 1, 1961, which together with the Klamath Marsh had a realization value not in excess of $90,000,000, would be transferred to the National Forest System.[28] The Klamath plaintiffs object to this provision, under which the ten units were ultimately taken,[29] as insuring that the defendant would acquire the lands, while at the same time setting an arbitrary value for them which deprived the plaintiffs of just compensation. Again, these plaintiffs misconstrue both the purpose and the operation of the $90,000,000 limitation. As previously noted, Congress imposed a minimum price on each unit of Klamath land, its realization value. The $90,000.000 clause of the 1958 Act was a way of assuring, within the limits of available public funds, that the Indians would receive that minimum price. If private purchasers were unwilling to acquire the lands at their realization value by April 1, 1961, then the Government would pay that price for as many of the unsold units as it could afford for $90,000,000. In no sense does this figure represent an arbitrary value placed on the Klamath lands; rather, it simply represents a budgetary limitation, the maximum amount of public funds that Congress was willing to expend to acquire any part of the tribal property. In other words, Congress did not say that any and all unsold Klamath lands would be acquired on April 1, 1961 for $90,000,000, but only that so much of the land would be taken as could be acquired for that sum. No arbitrary or legislative value was placed on the lands, individually or as a whole. The acquisition of the ten unsold units is therefore entirely unlike the disposition of "school lands" in the *Fort Berthold* case: lands granted by statute to the State of North Dakota for school purposes, for which the Government paid the Indians the arbitrary amount of $2.50 an acre, without any showing that this compensation bore any relation to the value of the land. Three Affiliated Tribes of Fort Berthold Reservation v. United States, *supra*, 390 F.2d 686, 694–695, 182 Ct.Cl. 543, 558–559 (1968).

There remains only to add, on these ten Klamath Forest units, that the record is clear that, until the lands were turned over to the Federal Government in 1961, the defendant continued to administer the areas for the benefit of the withdrawing Indians, and all income generated by the lands was credited to the withdrawing group. All the units were treated as Indian land until the actual transfer.

█ · For these reasons, we hold that the ten unsold "sustained yield" units of the Klamath Forest were taken on April 15, 1961 when they were transferred by Proclamation of the Secretary of Agriculture to the National Forest System.

*The Klamath Marsh:* This tract, unlike the ten unsold Klamath Forest units, was definitely to be taken under the 1958 Act, although the date was subsequently advanced from that originally provided (see *supra*).[30] The Marsh was taken by proclamation on September 7, 1960. It contained no commercial timber and was never offered for sale; it was therefore never the subject of a sustained yield covenant, reversion provision, minimum price term, etc. The Marsh's realization value, as determined by the three review appraisals, was not only identical with its fair market value as set forth in those appraisals, but was also higher than the previous valuation affixed by Western Timber Services. Finally, as with the ten Forest units, it is uncontested that the defendant continued to administer the property for the group of withdrawing Indians until the time of actual transfer, and that all revenues from the Marsh were credited to them until that time.

█ The only argument which would support a taking of the Marsh on August 23, 1958, as claimed by the Klamath plaintiffs, is that the mere passage of the 1958 Act, which express-

---

28. 25 U.S.C. § 564w–1(d) (1964).

29. See note 17, *supra*.

30. 25 U.S.C. § 564w–1(f) (1964).

ly authorized a taking of the Marsh at a later time, itself constituted a taking. A similar contention was squarely rejected by the Supreme Court in Creek Nation v. United States, 302 U.S. 620, 58 S.Ct. 384, 82 L.Ed. 482 (1938). An 1891 Act had opened certain Creek lands to settlement and sale, and it was contended that the lands were taken as of the passage of the Act. The Court held, however, that the takings occurred only upon the actual disposition of lands under the Act, and that those dates of disposition were the proper ones for valuation. See too United States v. Goltra, 312 U.S. 203, 209, 61 S.Ct. 487, 85 L.Ed. 776 (1941); United States v. Sponenbarger, 308 U.S. 256, 267–268, 60 S.Ct. 225, 84 L.Ed. 230 (1939). It is also established law that neither the adoption of a plan of acquisition, Willink v. United States, 240 U.S. 572, 579–580, 36 S.Ct. 422, 60 L.Ed. 808, nor even the filing of a map under a plan of acquisition, Bauman v. Ross, 167 U.S. 548, 596, 17 S.Ct. 966, 42 L.Ed. 270 (1897); Shoemaker v. United States, 147 U.S. 282, 308–320, 13 S.Ct. 361, 37 L.Ed. 170 (1893), constitutes in itself a taking. And it is not at all unknown for Congress to provide for eminent domain takings to be effected in the future. See, e. g., Drakes Bay Land Co. v. United States, *supra*, 424 F.2d 574, 584ff., 191 Ct.Cl. 389, 407ff. (1970).

*Fringe lands, etc.:* What is left is the disposition of the fringe and grazing units, farm lands, miscellaneous and personal property. All of this property selected for sale was sold to the highest bidder without limitation on use and without any minimum price. The disposition of the property was delayed by the provisions of the 1957 Act, but not by the 1958 legislation, and was un-affected by the requirements of review appraisals and sustained yield covenants. The sales of these units were not encumbered by any restrictions and there is no evidence before us, or reason to believe, that their disposition was other than a good faith effort by the defendant to realize their full value for the Indians. There is therefore no possible basis for holding that the Government took them at any time.

*The 1958 Act as a whole:* Finally, the point is pressed that, even though none of the separate provisions of the 1958 Act would so taint the disposition-plan, individually or by themselves, as to invoke the concept of an involuntary taking, the combination of all the statutory parts does require us to hold that the Act as a whole constituted such a taking. We explicitly reject that view, as we have already done implicitly. Our discussion of the separate provisions, as they apply to this case, shows that the passage of the Act did not impose such immediate interferences with the Indians' use, possession, or rights as to require compensation to be paid as of the date of enactment, August 23, 1958. Nor is there any reason to question the good faith of Congress in passing the 1957 and 1958 amendments, or to determine that those pieces of legislation were deliberately or necessarily designed to diminish the Indians' rightful compensation, or to give them less than the full value to which they were entitled.[31] The Congressional history indicates otherwise. It shows that Congress was concerned with and aware of all of the Indians' interests and rights, and tried to satisfy them without harm to either the withdrawing or remaining members, or to the general interests of the community in

---

31. On this record we cannot say, moreover, that the triple requirements of the sustained yield covenant, the reversion provision, and the payment of realization value—for the sales of the large Klamath Forest units—necessarily meant that those areas would ultimately have to be acquired by the United States since no private parties would be willing to pur-chase under those conditions. There was, of course, the actual sale of the Antelope Desert Unit, and we cannot speculate or surmise, *a priori*, that other sales were rendered impossible by the three conditions. The House and Senate committee reports, cited in the text, *infra*, show that Congress expected sales to be made.

which those Indians had lived and in which most (or a large part of them) would continue to dwell. See H.Rep. No. 379, 85th Cong., 1st Sess. (1957); S.Rep. No. 92, 85th Cong., 1st Sess. (1957); H.Rep. 2278, 85th Cong., 2d Sess. (1958); S.Rep. 1518, 85th Cong., 2d Sess. (1958). See, also, Part II, *infra.*

II

■ The Anderson plaintiffs have a quite different theory. Their point is that the Antelope Desert, the ten unsold "sustained yield" units of the Klamath Forest, and the Klamath Marsh were all taken by the United States on August *13,* 1958. On that date (to be distinguished from August *23,* 1958, the day the 1958 Act was enacted), in the absence of any changes in the original Klamath Termination Act of 1954, federal supervision over the tribe would terminate under that legislation. These parties contend that the passage of the 1954 Act gave the withdrawing tribal members vested property interests not subject to later Congressional modification or defeasance, and that the failure of Congress to follow through on the initial 1954 plan constituted such a gross interference with these firm rights of the withdrawing Indians as to constitute a taking.

■ One flaw in this position is that the 1954 Act itself stated that personal property rights of the individual members in tribal property would be created when the final tribal roll was published in the Federal Register.[32] Even in the absence of such a statutory provision, the rule is well settled that no individual vested rights are normally created in Indians until promulgation of the final roll. Choctaw Nation v. United States, 100 F.Supp. 318, 320–322, 120 Ct.Cl. 734, 737–741 (1951), cert. denied, 343 U.S. 955, 72 S.Ct. 1050, 96 L.Ed. 1356 (1952). In this case the final roll was

not published until November 21, 1957. Previously, on August 14, 1957, Congress had amended the 1954 Act, extending the final termination date to August 13, 1960.[33] Thus, even if we were to accept *arguendo* their view of the consequences of "vesting", we would have to hold that, as of the date the final roll was promulgated, the Anderson plaintiffs had no right, vested or otherwise, to the original August 13, 1958 termination on which they now insist.

We would, in any event, be loath to adopt the argument that the mere passage of the original Termination Act gave the Anderson plaintiffs immutable rights. That rule would in effect freeze Congress into a position once taken and deny it the right to accommodate its Indian enactments, within a short time, to changed circumstances. What necessitated the 1957 and 1958 amendments in this case was in no sense a Congressional desire to deprive the Indians of the fair value of their lands, or to reduce their compensation, but the recognition that substantially greater numbers of Indians would choose to withdraw than had been anticipated in drafting the 1954 legislation. In 1957 Congress gave itself more time to consider the consequences of a massive withdrawal by delaying the termination scheme, and in 1958 it substantially modified its original plan to meet that prospect. Courts should not look with squinty eyes at such bona fide modification of Indian legislation to fit changed or newfound circumstances, especially where it is obvious, as in this instance, that the whole matter is still in flux and that individual rights have not yet become firm or settled in any realistic sense.

It may be, as plaintiffs say, that the postponement in the dates of acquisition or sale of the tribal lands happened to coincide with a drop in the timber market, but such a detriment-in-fact would

32. Ch. 732, § 4, 68 Stat. 718 (1954), as amended, 25 U.S.C. § 564c (1964). Upon publication, however, only a limited property interest was created. See note 6, *supra.*

33. 71 Stat. 347 (codified in scattered sections of 564, 25 U.S.C. (1964)).

be on the same remediless plane as a good faith failure by Congress to pass the original Termination Act until 1958 because of differences of opinion or slowness in the grinding of the legislative mills—or, for that matter, the failure of Congress to pass the original Termination Act some years before 1954. No one could say that such a Congressional delay, even though it resulted in a loss-in-fact, would amount to an involuntary taking. We think that what occurred here was entirely comparable, and that any decline in values after August 1958 (not due to the passage of the Termination Act of 1954) must be borne by plaintiffs as part of the non-reimbursable cost of our accepted legislative process.

Nor are the Anderson plaintiffs right in their claim that the 1954 Act created a contract, between the Federal Government and the thereafter-withdrawing Indians,[34] which had to be carried out, in terms, at the peril of a breach of obligation by the United States. The language of the statute neither expresses nor implies such an undertaking, and its legislative history does not show any purpose on the part of Congress to bind the United States. A contractual agreement of this type would require some definite expression of such intent, and there was none here. *Cf.* Chippewa Indians of Minnesota v. United States, 307 U.S. 1, 4–5, 59 S.Ct. 687, 83 L.Ed. 1067 (1939); Pillager Bands of Chippewa Indians v. United States, 428 F.2d 1274, 1279, 192 Ct.Cl. 698, 707 (1970). The Anderson plaintiffs, in a word, stand on no higher or different ground than do the Klamath plaintiffs.

### III

We hold, in summary:

1. There was no eminent domain taking by the defendant of the Antelope Desert Unit or of the fringe or miscellaneous units, or of personal property. If a claim of breach of fiduciary duty (through failure to obtain a good price) is made as to these properties,[35] the valuation dates should be May 3, 1960 for the Desert unit (when it was sold to a private corporation) and the various dates of sale for the other assets.

2. The ten unsold "sustained-yield" units of the Klamath Forest were taken by the defendant by eminent domain on April 15, 1961, and should be valued as of that date.

3. The Klamath Marsh was taken by the defendant by eminent domain on September 7, 1960, and should be valued as of that date.

■ In valuing the ten units of the Klamath Forest and the Marsh for just compensation purposes, there should be excluded from the fair market value on the respective valuation dates any diminution or enhancement in value attributable to that portion of the Klamath termination project which envisaged acquisition (potential or certain) by the Federal Government of the lands. Drakes Bay Land Co. v. United States, *supra*, 424 F.2d 574, 584, 191 Ct.Cl. 389, 408 (1970).

The case is remanded to the trial commissioner for further proceedings in accordance with this opinion.

### APPENDIX

Excerpt From Commissioner
Spector's Opinion

### III

*Contentions of the Parties*

*A. The Klamath Plaintiffs' Claims*

With respect to the first issue, the Klamath plaintiffs contend that defendant took the 10 forest units and the

---

34. The specific withdrawing members were not yet known, of course, since the election to withdraw, or to stay, was still in the future at the time the 1954 Act was passed.

35. As pointed out in Part I, *supra*, the court does not now decide whether or not such a claim would lie under 28 U.S.C. §§ 1491 and 1505, as they apply to these cases.

marsh on August 23, 1958. They have selected this date as the date of taking of the forest units because in their view the restrictions imposed by the Act of August 23, 1958 upon the sale of the forest units, deprived them of control over the units and assured their acquisition by defendant, and their incorporation into the National Forest System. They claim that the following provisions combined to preclude the purchase by private purchasers of most or all of the forest: (1) The sustained yield requirement, which served to reduce the potential purchasers to those large enough to invest in a sustained yield forest; (2) the imposition of a price floor on each unit, which allegedly was higher than the price private purchasers would be willing to pay if required to practice sustained yield management;[31] and (3) the provision for forfeiture and reversion of title to the United States (for its own use and not in trust for the Indians) in the event the purchaser breached the sustained yield requirement. Moreover, the Klamath plaintiffs claim that the restrictions on the sale of the forest units decreased the value of the units, and thus prevented plaintiffs from receiving the fair market value of the units if offered on an open market without restrictions. As relief they ask for the difference between the fair market value of the units on the date taken and the price received, plus interest from the date of taking.[32]

The Klamath plaintiffs have selected August 23, 1958, as the date of taking of the marsh because by the terms of the Act of August 23, 1958, defendant was thereby given the exclusive right to acquire the marsh.

Although defendant concedes that it took both the marsh and the 10 sustained yield units, it takes the position that the dates of taking must be established by looking to the termination legislation itself. That legislation, it maintains, governs the rights of the parties. Thus, defendant contends that September 7, 1960, must be found as the date of taking of the marsh, since title to it was acquired on that date by Proclamation of the Secretary of Agriculture, as provided by the Act of August 23, 1958, as it was amended by the Act of September 9, 1959.[33] Likewise, defendant contends that April 15, 1961, must be found as the date of taking of the forest units which remained unsold on April 1, 1961, since title to them was acquired on that date by Proclamation of the Secretary of Agriculture, as provided by the Act of August 23, 1958.[34]

With respect to the second issue, the Klamath plaintiffs maintain that defendant took the properties sold to third parties without paying just compensation therefor as required by the fifth amendment, on the following dates: Antelope Desert Unit, August 23, 1958; personal property, on the dates of sale;

---

31. Under the 1958 Act, the "realization value" of each unit was set as the minimum price of each unit (25 U.S.C. § 564w–1(b) (1964)). In deriving that value, the review appraisers were required to estimate the fair market value of the forest units as if they had been offered for sale in a competitive market *without* limitation on use (25 U.S.C. § 564w–1(c) (1964)).

32. In connection with their claims for taking of the forest, marsh, and Antelope Desert, the Klamath plaintiffs ask for two types of interest: That "provided by law" and interest at the rate of 6 percent on the price paid, to run from the date of taking to the date the purchase price was deposited in the Treasury.

The plaintiffs also claim that minerals and water rights as well as power sites were taken by defendant, when the land to which they were attached or associated was taken. They ask that the value of these be added to the value of the land at the time it was taken.

On the basis of their proposed findings of fact, the Klamath plaintiffs apparently seek a declaration that both present and former members of the tribe have retained the hunting and fishing rights which they possessed prior to the termination of federal supervision.

33. Note 22 *supra*.

34. Note 21 *supra*.

fringe units (timberland not susceptible to sustained yield management and grazing lands), on the dates of sale. In addition, they claim the value of minerals and water rights, as well as power sites, were taken by defendant when the land to which they were attached or associated was taken. As relief they ask for the difference between the sale price of these properties and their fair market value on the dates taken, plus interest from the dates of taking.

The Klamath plaintiffs contend that the Antelope Desert Unit was taken by defendant on August 23, 1958, because the restrictions placed upon the sale of this property by the Act of August 23, 1958, prevented them from receiving the fair market value of the unit.[35] Because defendant did not acquire title or beneficial interest of this unit, the Klamath plaintiffs contend that a compensable taking can (and did) occur without the federal acquisition of title or the effecting of occupancy, if the effect of the governmental action was to deprive the owner of all or most of his interests in the property. They claim that the restrictions deprived them of the fair market value of the unit because the sustained yield requirement decreased the amount which could have been obtained for the unit if offered on the open market without restrictions as to use.

Moreover, they contend that a conveyance of Indian property by defendant to third parties can constitute a compensable taking, if designed to satisfy the interests of the Government or of third parties. They urge that the restrictions imposed by the 1958 Act upon the sale of the Antelope Desert Unit, which were incorporated as conditions in the conveyance of the unit, were motivated by defendant's desire to enforce conservation measures and to protect the economic welfare of the tribe's neighbors. They claim that defendant imposed the sustained yield requirement because of its concern that, absent such a requirement, the sale of the timber units on a clear cutting basis would have caused damage to the economy of the Klamath Basin through the glutting of the local timber market, and in the destruction of the watershed, water resources, wildlife, and scenic beauty resulting from the elimination of the forest.

This last ground forms the basis for the Klamath plaintiffs' alternative theory of recovery, based generally on the manner in which defendant terminated its supervision over plaintiffs and their property. They claim that, at least throughout the termination process, defendant owed them the duties of a fiduciary because of their status as wards of the Federal Government. They contend that among the duties of defendant, as a fiduciary, was that of safeguarding plaintiffs' property interests by acting at all times with their best interests in mind. They claim that defendant breached this duty by the amendments to the 1954 Act which were primarily designed to protect non-Indian interests. They point to the restrictions imposed by the 1958 Act upon the sale of the timber units, as the means used by defendant to effect the protection of these non-Indian interests. Since, in their view, defendant was under a duty to obtain the highest price possible for the units, and since the restrictions placed on the sale of the units prevented them from receiving the fair market value of the units, they ask for the difference between the fair market value of the units on August 23, 1958, and the sale price, plus "interest as provided by law."[36]

---

35. These restrictions were the same as those imposed upon the sale of the other sustained yield timber units.

36. The Klamath plaintiffs also claim that the breach by defendant of its fiduciary obligations may have been the cause of delays in the disposition of the properties sold on behalf of withdrawing Indians. They contend that any such delays were financially damaging to them. Therefore, they ask for delay damages, unless the amount of such damages is less than the relief requested above. However, in the

Defendant denies that it took the Antelope Desert Unit, since nothing in the termination legislation authorized the federal acquisition of that unit, and since it was not in fact acquired by defendant. It therefore contends that any liability for the sale of the unit must be rooted in its failure, if any, to observe the standard applicable when the United States sells property for the benefit of Indians. Defendant contends that, to recover, plaintiffs must show that the price received for the Antelope Desert Unit was so far below the fair market value as to constitute gross negligence, fraudulent conduct, or an abuse of defendant's fiduciary duties. Defendant also contends that, in the event relief is given on this claim, plaintiffs are not entitled to interest. Its position is that, where relief is not predicated on the fifth amendment, interest cannot be assessed against the United States in the absence of a treaty, statute, or contract requiring the payment of interest. It claims that no such treaty, statute, or contract exists in the present case.

With respect to the sale of the fringe units and the personal property, defendant takes the position that Klamath plaintiffs' proposed findings should be disregarded because of their failure to cite evidence in support of the alleged dates of taking.

Finally, defendant concedes that the value of minerals, power sites, and water rights should be considered when determining the value of the land to which these rights were attached or associated at the time the land was taken.

### B. The Anderson Plaintiffs' Claims

Unlike the Klamath plaintiffs, the Anderson plaintiffs represent only the interests of withdrawing Indians. As previously outlined, the Anderson plaintiffs consist of 150 withdrawing Indians, each suing on his own behalf and as representative of the Indians who withdrew, and as representative of the class of Indians who withdrew and who objected to the amendments to the Termination Act of August 13, 1954. Also unlike the Klamath plaintiffs, the Anderson plaintiffs contend that their property interests were taken by defendant on one date, August 13, 1958. On that date, absent the amendments to the 1954 Act, federal supervision over the tribe and its members would have terminated.[37] The essence of the Anderson plaintiffs' claim is that defendant's failure to terminate federal supervison on the date provided by the Termination Act of 1954 deprived them, as of that date, of property interests for which they have not been justly compensated as required by the fifth amendment.

---

event that the commissioner should find a date of taking later than August 23, 1958, and if on the later date the fair market value of the properties taken is lower than that which would have prevailed on August 23, 1958, then they ask for the delay damages as a supplement to the differential between the fair market value on the later date and the sale price.

It is unclear whether the Klamath plaintiffs intend for the property sold to third parties, other than the Antelope Desert Unit, to come within the breach claim, although it appears that they do. This property was sold to the highest bidder without restrictions as to use. Klamath plaintiffs' proposed finding 71 reads as follows:

"71. *Properties Sold to Third Parties:* The United States was trustee of the plaintiffs and their property prior to

and during termination. Because of its status as trustee, the defendant possessed full power and control over the plaintiffs' property, including the power to dispose of that property regardless of the wishes of the plaintiff. Therefore, as to property to which it did not take title, but, which it sold to other parties pursuant to the provisions of the Termination Act, as amended, it is held that the United States is liable to the plaintiffs for the difference, if any, between the market value of the property and the sale price received, plus interest as provided by law."

37. The 1954 Act, it will be recalled, provided for the termination of federal supervision at the earliest practicable time but not later than August 13, 1958, Ch. 732, § 6(b), 68 Stat. 719 (1954), as amended, 25 U.S.C. § 564e(b) (1964).

According to the Anderson plaintiffs, these property interests were created in their favor by the Termination Act of 1954. They contend that prior to the enactment of the Act, as members of the tribe they possessed individual property interests in the tribal property which consisted of a mere privilege of use in communal property during each plaintiff's lifetime. They insist that the 1954 Act altered the status of each member's rights in the communal or tribal property by specifically endowing each member, whose name appeared on the final tribal roll, with a "beneficial interest" in the tribal property. By the termination Act of 1954, that beneficial interest was declared to be personal property which could be bequeathed and inherited and which, with the approval of the Secretary of Interior, could be alienated or encumbered.[38]

In addition to asserting that the interest of each tribal member, regardless of whether he elected to withdraw or remain in the tribe, became a "personal property' interest, the Anderson plaintiffs maintain that, by virtue of the 1954 Act, the personal property interest of the withdrawing members acquired an additional characteristic. The 1954 Act required defendant to set aside that portion of the tribal estate which, if sold at the appraised value, would provide sufficient funds to pay to the withdrawing Indians the money equivalent of their property interest in the tribal property. The Anderson plaintiffs contend that, when a portion of the tribal property was so set aside, it ceased to be part of the tribal property and instead became property held by defendant on behalf of the withdrawees. It is to this property that the Anderson plaintiffs' property interests allegedly attached. Since, in their view, the 1954 Act obligated defendant to sell the property in order to satisfy their interests therein, the Anderson plaintiffs contend that, contrary to the Constitution, these interests were impaired when by August 13, 1958, defendant had failed to dispose of the property and to distribute the proceeds to the withdrawees, as provided by the Act. They also contend that their interests in the property set aside were further impaired when a sale of the property in the manner originally contemplated by the 1954 Act, was burdened by the restrictions imposed in the amendments to that Act.

Apart from their fifth amendment claim, the Anderson plaintiffs assert an additional ground for holding defendant liable for the manner in which it effected the termination of federal supervision. They contend that, by failing to complete the termination process by August 13, 1958, defendant breached an agreement between it and the withdrawees to sell the property set aside for their benefit and to distribute the proceeds by a date no later than August 13, 1958. As relief they ask for damages, presumably the

---

38. Section 3 of the 1954 Act, it will be remembered, provided for the closing of the tribal roll as of midnight, August 13, 1954. No child born thereafter was to be eligible for enrollment. Ch. 732, § 3, 68 Stat. 718 (1954), as amended, 25 U.S.C. § 564b (1964). Section 4 of the Act provided that, upon the publication of the final roll in the Federal Register, the rights or beneficial interest in the tribal property of each person whose name appeared on the roll, were to constitute personal property which could be inherited or bequeathed. However, without the approval of the Secretary of Interior, such personal property could not be alienated or encumbered until the Secretary transferred the title to such property as provided in § 6. Ch. 732, § 4, 68 Stat. 718 (1954), as amended, 25 U.S.C. § 564c (1964). Section 6 authorized the Secretary to convey title to property sold to pay the withdrawing Indians their shares in the tribal property, and to transfer title to the remaining property to the legal entity contemplated in the tribal management plan. Ch. 732, § 6, 68 Stat. 719 (1954), as amended, 25 U.S.C. § 564e(a) (1964). The final roll was published in the Federal Register on November 21, 1957, 22 Fed.Reg. 9303, et seq. (1957).

difference between the fair market value of the property set aside on August 13, 1958, and the price actually received, plus interest as of August 13, 1958.

As previously indicated, prior to the termination of federal supervision, there were two factions favoring termination but opposed to one another as to the manner in which termination should be accomplished. The faction led by the tribal governing body insisted on retaining the tribal entity and tribal rights; the other faction favored the immediate vesting of the individual Indian's rights, the dissolution of the tribe, and the immediate distribution of the tribal assets to the individual Indians. Prior to the enactment of the 1954 Act, representatives of both factions agreed that the termination legislation pending before Congress should be amended to provide for (1) an appraisal of the tribal assets; (2) an opportunity for each member to determine whether to withdraw from the tribe and have his interest converted into money, or to remain in the tribe and participate in a tribal enterprise; and (3) a selection and sale of those tribal assets, which if sold on the basis of the appraised value, would generate sufficient funds to pay the withdrawing members their shares in the tribal property. These principal points of agreement were submitted by a representative of the Interior Department to the House Subcommittee on Indian Affairs, which adopted them as amendments to the proposed termination legislation. They subsequently became part of the 1954 Termination Act.

The Anderson plaintiffs now contend that the United States became bound by the above described agreement when Congress incorporated the amendments into the 1954 Act, and when the President signed the Act into law. They allege that defendant breached this agreement when, contrary to its terms and without the consent of the withdrawees, it failed to dispose of the property set aside for their benefit and to distribute the proceeds by August 13, 1958, as provided by that Act; and when, through subsequent amendments to the Act, it imposed restrictions upon the sale of the property set aside, and repudiated the single appraisal provided by the original 1954 Act embodying the agreement. They contend that defendant cannot excuse the breach on the ground that it was exercising its political sovereignty, because with respect to the withdrawees, defendant was acting in its capacity of trustee for its Indian wards.

With regard to the Anderson plaintiffs' taking claim, defendant denies that it took any of their property, except that to which it acquired title, namely, the Klamath Marsh and the 10 unsold sustained yield forest units. With respect to these properties, defendant contends that the termination legislation is conclusive as to dates of taking. That legislation, it asserts, precludes a finding that August 13, 1958, was the date of taking of those properties because nothing in the legislation provided for federal acquisition of those properties on that date or any other date, except the dates on which the United States in fact acquired those properties. Thus, as in the *Klamath* case, defendant argues that liability, if any, under the fifth amendment must be measured from the actual, physical dates of taking.

Defendant, moreover, denied that the Anderson plaintiffs acquired title or other property interests in the property selected for sale for their benefit. Its position is that the 1954 Act did not alter the status of tribal property, as tribal property. On the contrary, it points out that section 6 of the Act authorized it to convey title to *tribal* property, which if sold at the appraised value, would provide sufficient funds to pay the members who elected to have their interests in tribal property converted into money. It further maintains that the status of the property was not altered by the provisions of the Act requiring the closing of the tribal roll

and declaring that, upon the publication of the final roll, the interests in the tribal property of each member would constitute inheritable and devisable "personal property." It alleges that those provisions were designed (1) to establish an unchanging membership in the tribe which up to that time began and ended with the birth and death of a member, and (2) to permit the share of each member to pass to heirs or devisees, since prior to the Act the rights of a member in tribal property could not be bequeathed or inherited. It therefore contends that, at most, the 1954 Act gave the withdrawees the right to share in the proceeds from the sale of the property set aside for their benefit, which right, it alleges, was complied with. Alternatively, defendant maintains that even if plaintiffs acquired a property interest in the property selected for sale, under the fifth amendment it can only be liable for that portion of such property as it acquired and that such liability must be determined as of the dates of taking provided by the termination legislation.

With respect to the breach claim, defendant denies the existence of a contract which bound it to perform the obligations embodied in the 1954 Act, and precluded it from modifying those obligations through amendments to that Act. In the first place, defendant points out that its representatives at discussions preceding the enactment of the 1954 Act did not have the authority to bind the United States. Moreover, it denies that Congress intended by the 1954 Act to create a binding agreement with plaintiffs, absent a contrary indication in the Act itself or in its legislative history. Finally, defendant insists that the contract must fail for lack of identifiable parties. It contends that the Anderson plaintiffs could not have been parties to a 1954 agreement, since their identity as withdrawees was not known until the election held in April 1958.